**In re THE DREXEL BURNHAM LAMBERT GROUP, INC., et al., Debtors.**

**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**DREXEL BURNHAM LAMBERT IN-CORPORATED, the Drexel Burnham Lambert Group, Incorporated, et al., Defendants.**

Nos. 90 Civ. 6954 (MP), 90 B 10421 (FGC) and 88 Civ. 6209 (MP).

United States District Court, S.D. New York.

Aug. 20, 1991.
As Amended Aug. 27, 1991.

Peter R. Gruenberger, Weil Gotshal & Manges, New York City, for debtors.

Melvyn Weiss, Milberg Weiss Bershad Specthrie & Lerach, New York City, for Securities Litigation Claimants Group.

David Berger, Berger & Montague, Philadelphia, Pa., for plaintiffs, MDL 732 Co–Lead/Liaison Counsel.

Thomas D. Barr, Cravath Swaine & Moore, New York City, for FDIC.

Dennis J. O'Brien, Eckert Seamans Cherin & Mellot, Pittsburgh, Pa., for Liggett Group and Liquid Green Trust.

I. Walton Bader, Bader & Bader, White Plains, N.Y., for State of Fla. Pension Fund.

Alan R. Plutzik, David B. Gold, P.C., San Francisco, Cal., for plaintiffs William Fries, II, John Lippitt, Jacquelyn Tribolet.

Stanley Nemser, Wolf Popper Ross Wolf & Jones, New York City, for plaintiffs, MDL 732 Co–Lead/Liaison Counsel.

Richard Kirby, S.E.C., Washington, D.C.

David T. Eames, Bodian & Eames, New York City, for Citibank, Lloyds Bank, London Imperial Bank of Commerce.

David Eaton, Kirkland & Ellis, New York City, for National Bank for Yugoslavia.

William J. Brown, Phillips Lytle Hitchcock Blaine & Huber, New York City, for HongKongBank (London) Ltd. and William Nelson Harris.

Whitton E. Norris, III, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., Boston, Mass., for Hart Holding Co., and Reeves Industry, Inc.

Edward Griffith, Katten Muchin & Zavis, New York City, for American Intern. Group.

Alan Kornberg, Paul Weiss Rifkind Wharton & Garrison, New York City, for Michael Milken.

William Leighton, pro se.

## DECISION CONSOLIDATED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILTON POLLACK, Senior District Judge.

FRANCIS G. CONRAD, Bankruptcy Judge.

### FINDINGS OF FACT

#### I.

1. By Order dated May 10, 1991, this Court certified temporarily, and for settlement purposes only, a mandatory non-opt-out class of all securities litigation claimants (the "Mandatory Class") and two mandatory, non-opt-out subclasses (the "Mandatory Subclasses"), pursuant to Bankruptcy Rules 7023 and 9019 and Rules 23(a) and (b)(1)(B) of the Federal Rules of Civil Procedure.

2. The Court also preliminarily approved the terms of the compromise and settlement embodied in the Securities Litigation Claims Settlement Agreement dated May 3, 1991 (the "Settlement") for purposes of scheduling a hearing thereon and to direct notice to be sent to the Class Members.

3. Notice of the August 9, 1991 hearing on the fairness, reasonableness and adequacy of the Settlement was mailed to more than 161,000 members of the Class and Subclasses. In addition, summary notice was published on two separate occasions in each of six different newspapers (*The Wall Street Journal, New York Times, Los Angeles Times, The Financial Times, The Chicago Tribune* and *The International Herald Tribune*) throughout the United States.

4. In a Memorandum filed herein, dated August 9, 1991, the Court made brief basic findings of fact and rulings and the same are hereby incorporated herein, and for convenience restated as follows:

Due deliberation having been had on all the foregoing, it is ordered that:

1. A sufficient evidentiary basis has been established herein for each of the following:

A) All the requirements of the Federal Rules of Civil Procedure 23(a) and 23(b)(1)(B) have been satisfied for certification of the mandatory non-opt-out class and subclasses A and B of all securities litigation claimants who timely filed proofs of claim in the Chapter 11 cases of the Debtors;

B) The settlement that has been proposed is fair, reasonable, and adequate, in actual compliance with Federal Rule of Civil Procedure 23(e);

C) The amended plan of distribution of the civil disgorgement fund is fair, reasonable, and adequate.

D) The objections to the formation and appropriateness of the mandatory classes and their incidents lack merit, and the request of the creditors Liggett Group and Liquid Green Trust to opt out are denied in the Court's discretion;

E) The objections to the settlement are unsupported in fact and lack merit in the face of the totality of the compromise established.

In more detail the following are the supplemental and additional Findings of Fact herein.

## II.

5. In 1988, the SEC filed the action entitled *SEC v. Drexel Burnham Lambert Inc., et al.*, 88 Civ. 6209 (MP) (S.D.N.Y.1988) (the "SEC Action") against, among others, Drexel Burnham Lambert Incorporated ("Inc."), The Drexel Burnham Lambert Group, Inc. ("Group") and Michael Milken ("Milken") who had been the head of Inc.'s High Yield and Convertible Bond Department ("HYBD"). The SEC Action was presided over by this Court.

6. Group and Inc. settled the SEC Action and agreed to pay a total of $350 million, to be deposited into a civil disgorgement fund established to satisfy eligible civil litigants who had federal securities claims against Drexel arising out of the activities of the HYBD, occurring between January 1, 1978 and January 24, 1989 (the "Drexel Fund"). Of that amount, $200 million was paid pre-petition, and the Settlement provides for the $150 million balance to be paid upon consummation of the Plan.

7. Milken later settled the SEC Action by paying a total of $400 million to a disgorgement fund established for the benefit, to the extent thereof, of civil claimants for compensatory damages against him (the "Milken Fund").

## III.

8. On February 13, 1990, Group filed with the Bankruptcy Court for the Southern District of New York a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("the Bankruptcy Code").

9. Subsequently, Inc. and 18 of Group's other subsidiaries (collectively, the "Debtors"), many of which had trading capabilities in domestic and international securities, income, equity and interest-rate products, commodities and currencies, either filed a petition for relief or were the subject of an order for relief under Chapter 11.

10. By order of the Bankruptcy Court dated June 20, 1990, the Debtors' Chapter 11 cases were consolidated for procedural purposes only pursuant to Bankruptcy Rule 1015(b). They currently continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11. On June 29, 1990, the book value of the assets of Group and its subsidiaries on a consolidated basis was $3.27 billion. This amount declined to $2.54 billion by December 28, 1990 and was about $2.391 billion as of June 28, 1991.

12. The amount of liabilities reflected on the consolidated balance sheet of Group and its subsidiaries declined from $2.69 billion on June 28, 1990 to $2.502 billion on June 28, 1991. However, these figures do not reflect off-balance sheet liabilities such as contingent and disputed claims against Debtors.

13. As of May 29, 1990 (the date Inc. filed its Chapter 11 petition), the disputed contingent litigations entailed approximately 400 pending cases in federal and state courts and in various arbitration fora which named one or more of the Debtors as defendants or respondents (the "Pending Actions"). One group of cases in the Pending Actions—the *Ivan Boesky Litigation*, also known as MDL 732—has been presided over by this Court since 1987.

14. By order dated July 23, 1990, the Bankruptcy Court set November 15, 1990 as the deadline for filing proofs of claim and proofs of interest against the Debtors' estates (the "Bar Date"), except for certain claims against the estates, including those

914

of the Internal Revenue Service (the "IRS"). February 13, 1991 was fixed as the deadline for the IRS to file its proof of claim against the Debtors' estates.

15. Over 15,000 claims were filed against Debtors by the Bar Date including the claims of those who had initiated Pending Actions. The aggregate face value of those claims which set forth a claimed amount of damages exceeds $200 billion. Additionally, approximately 6,500 claims fail to set forth any amount of claimed damages. After eliminating duplicative, multiple, late and other defective claims subject to expungement under the Bankruptcy Code, claims with an aggregate face value between $29 billion and $30 billion remain. As such, the claims asserted against the Debtors are more than ten times greater than the current assets of the Debtors' estates.

16. Out of the 400 Pending Actions extant at the time of Inc.'s filing, about 110 were pre-petition court actions pending against one or more of the Debtors which were based upon federal and state securities laws, the RICO statutes, or the antitrust laws (the "Pending Securities Actions").

17. These Pending Securities Actions and later filed similarly-based securities law claims (non-duplicative) accounted for approximately 850 of the claims filed against the Debtors by the Bar Date. These claims aggregate well in excess of $20 billion (including claims not having a clear face value). These claims, including the Pending Securities Actions, became known in the Debtors' bankruptcy cases and in the Settlement as the "Securities Litigation Claims."

18. The grossly disproportionate ratio of liabilities to assets faced a limited and continually dwindling fund from which Debtors could pay only a fraction of the successful claims asserted against them.

19. During the Summer of 1990, before the Bar Date and even before they all filed their actual claims against the Debtors, a group of Securities Litigation Claimants sought official committee status from the United States Trustee on the ground that they represented important Drexel contingent creditors all of whom showed enough common ground to be representative of other Securities Litigation Claimants. While such status was denied them, Debtors negotiated a Bankruptcy Court-approved stipulation with this group, who named themselves the Securities Litigation Claimants Group ("SLCG"), pursuant to which Debtors agreed, *inter alia,* to treat SLCG as parties-in-interest and negotiate with them in good faith on various matters, including the terms of any reorganization plan affecting such claims.

20. The original members of SLCG were: the SEC; Cravath, Swain & Moore, counsel for the FDIC/RTC; Milberg Weiss Bershad Specthrie & Lerach ("Milberg Weiss"), who were lead or co-lead counsel in numerous class and derivative actions against Drexel; Berger & Montague, P.C. and Wolf Popper Ross Wolf & Jones, who were lead/liaison counsel for class plaintiffs in MDL 732 (the securities actions arising out of the SEC actions against Boesky, Levine, Milken and Drexel); and several other individual claimants. The charter which created SLCG, as set forth in a Bankruptcy Court ordered stipulation, specifically stated that these claimants organized themselves into SLCG "in order to advance interests of common concern."

21. Later on, other claimants, including an objector to the Settlement, Liggett Group, and another claimant with similar claims based on the purchase of Integrated Resources commercial paper, joined SLCG.

22. Prior to the Bar Date, Debtors attempted, but failed, to settle the Pending Actions on an individual basis, because of the sheer number, complexity and the amount of the Securities Litigation Claims being filed against Debtors.

23. In an effort to free the settlement process or to remove through litigation the blocking effect of these huge Securities Litigation Claims, Debtors moved on October 26, 1990, for the withdrawal of the reference of jurisdiction from the Bankruptcy Court for the purpose of estimating and capping all the Securities Litigations Claims (the "Withdrawal Motion").

24. At a status conference held shortly after Debtors filed the Withdrawal Motion, this Court directed the Debtors and members of SLCG to engage in a joint effort to find common ground for a format in which to estimate the Securities Litigation Claims.

25. On November 27, 1990, the return date of Debtors' Withdrawal Motion, the interested parties appeared before this Court to argue the respective merits of estimation under section 502(c) of the Bankruptcy Code.

26. The Court indicated that it disagreed with those who wished to estimate all Securities Litigation Claims, calling it an exercise in futility if Debtors' liquidation was the likely result, and rejected the notion that over 100 separate estimations and settlements of matters of this size and complexity could be concluded in this century (and this applied then only to the Pending Securities Actions, not to the further Securities Litigation Claims filed prior to the Bar Date). The Court adjourned the hearing until February 18, 1991 with instructions to representatives of the Debtors, the Official Committees of Creditor and Equity stockholders and four specific representatives of the Securities Litigation Claimants to explore the possibility of reaching a global agreement on the basis of a consensual estimation so as to reduce the amount of the Securities Litigation Claims.[1]

27. Following the November 27, 1990 hearing, with the encouragement and supervision of the Court, counsel for the Fixed Creditors, the representatives of the Securities Litigation Claimants and the Debtors in earnest began a series of arduous, arm's-length negotiations focusing on global settlement of the Securities Litigation Claims through consensual estimation.

28. Over the course of numerous sessions, involving scores of experienced counsel for all the negotiating parties, specializing in litigation, bankruptcy, corporate and tax matters, efforts were made to finalize the terms of the proposed settlement.

29. Notwithstanding their efforts at settlement, the negotiating parties continued to press their positions through motion practice in both the Bankruptcy Court and this Court, including another motion by the Debtors to expedite estimation of the FDIC/RTC claims.

30. The February 18, 1991 hearing on the adjourned return date on Debtors' motions to withdraw the reference was presided over by both the District and Bankruptcy Courts. Although the negotiating representatives reported at that hearing that they had agreed to a broad outline of a global settlement proposal and had initialed a "Heads of Agreement," this Court stated that unless the Securities Litigation Claimants soon reached a binding estimation of the value of their claims by written agreement, the case would be converted into a Chapter 7 case pursuant to section 1112(b) of the Bankruptcy Code.[2]

31. During the February 18 hearing, Dennis J. O'Brien, appearing as counsel for the Liggett Group, Liquid Green, and USX Corporation, indicated that he had not been involved in the prior negotiations. The Court commented, "it would have been impossible to have reached this desirable point with any more conferees than we have had." Mr. O'Brien responded, "That's why we didn't speak before now, Your Honor."[3]

32. At the conclusion of the February 18 hearing, the Debtors were directed to prepare an order to show cause, returnable on April 4, 1991, why the Chapter 11 cases should not be converted to Chapter 7 cases. All interested parties were notified.

33. By order dated February 19, 1991, the Court withdrew the reference as to all of the Debtors' Chapter 11 cases, retained jurisdiction of the Securities Litigation Claims and other non-core, non-related matters and re-referred all core matters to the Bankruptcy Court.

34. On February 19, 1991, the negotiating representatives reduced to writing and

---

1. Nov. 27, 1990 Transcript at 4, 12, 14–15.

2. Feb. 18, 1991 Transcript at 6–8.

3. Feb. 18, 1991 Transcript at 20.

executed a "Securities Litigation Agreement in Principle" which incorporated the broad outlines of the settlement in principle that had been reported to this Court on February 18. From that point until the conversion hearing before this Court on April 4, 1991, the representatives of the negotiating parties met in further around-the-clock, daily sessions together and in small groups in arm's length negotiations on the details of the terms of Settlement to be incorporated in the Agreement.

35. On April 4, 1991, multitudes of interested parties and their counsel appeared at the hearing on conversion of this case to a Chapter 7 liquidation.

36. The Court received evidence at the April 4 hearing on the financial condition of the Debtors and took evidence in the form of affidavits, certifications and other documentation on the effect a Chapter 7 liquidation would have on the Debtors' assets and the Debtors' ability to adequately satisfy the claims of its creditors.

37. This evidence indicated that nearly half of the Debtors' estates consisted of illiquid and/or difficult to value assets such as high yield securities, partnership and real estate interests and leveraged buy out properties and leveraged leases, all of which potential multiple trustees in a Chapter 7 liquidation would be under a duty to dispose of in a prompt manner, without regard to maximization of the value of these assets and with the risk that distress sale values would result.

38. This Court also heard from all persons who wished to be heard on conversion to Chapter 7 or on any other issue. Counsel for all of the negotiating parties presented their views on the progress of the Settlement and on the confirmability of the joint plan of reorganization (the "Plan") that they were negotiating. The representatives of the Securities Litigation Claimants also made clear that the Settlement was being negotiated on a mandatory class action basis.[4]

39. All persons and entities represented at the hearing were afforded an opportunity to be heard and to contribute pro or con to the issues before the Court.

40. Mr. O'Brien appearing on behalf of The Liggett Group, Liquid Green and U.S.X. Corp., asserted that although his clients were members of SLCG, he had not sat in the negotiations, that he still preferred conversion into Chapter 7. The Liggett Group and Liquid Green, had purchased $13 million of the commercial papers of Integrated Resources through Drexel; they have filed a joint objection to the Settlement. U.S.X. Corp. has not objected to the Settlement and neither have other purchasers through Drexel of approximately $100 million of such commercial paper.

41. In December 1990, Debtors successfully moved the Bankruptcy Court under Bankruptcy Rule 2004, for an order compelling the Securities Litigation Claimants to respond to a nine-point questionnaire concerning their claims.[5] This questionnaire was mailed starting on December 26, 1990 to over 900 such claimants. Responses were received from 615 of them, including six responses from objector Liggett Group and responses from other objectors such as Hart Holdings Co./Reeves Industries Inc.

42. The questionnaire responses provided significant insight to the bases, amount and types of securities claims filed against the Debtors. Copies of the questionnaire responses were requested by, and provided to, the SLCG representatives during the course of settlement negotiations.

43. Pursuant to a motion made by the FDIC/RTC, the Bankruptcy Court ordered Debtors to produce to that Class representative and there were accordingly disclosed all non-privileged Bankr. Rule 2004 materials created over the course of 8 months of intensive discovery initiated by the Official Committees of Creditors and Equity Shareholders.

44. Additionally, each of the Class negotiators had access to voluminous records, discovery and pleadings from related pre-

---

**4.** Apr. 4, 1991 Transcript at 1–14, 24–37.

**5.** Dec. 20, 1990 Transcript at 82–83.

petition actions against the Debtors and other third parties, and post-petition actions brought against such third parties, and to the complete public record of these Chapter 11 cases.

45. Since the well-publicized settlement discussions began almost nine months ago, no objector has moved the Court to obtain any discovery concerning the Settlement to support any objection made thereto.

46. Between April 4 and May 10, 1991, the representatives of the parties continued to negotiate and draft the terms of the Settlement and the proposed Plan. This process involved the negotiation of a highly sophisticated transaction, implicating corporate, tax, bankruptcy, regulatory and litigation expertise and consequences. The outcome was the Settlement, dated May 3, 1991, and the attached Exhibits, which included the proposed Plan Term Sheet. The Settlement is intricate; it has been derived from a process that involved direct and vigorous competition for a limited, dwindling fund of Debtors' assets between Fixed Creditors, on the one hand, and Securities Litigation Claimants on the other.

47. The Settlement also created an opportunity for the Debtors to achieve a settlement with the IRS on July 26, 1991, whose facial $5.3 billion claim in and of itself vastly exceeded Debtors' assets. The IRS settlement appears (pending Bankruptcy Court approval) to be fair and reasonable and makes it practical to project a plan of reorganization. The Settlement and IRS settlement overcome two of the biggest stumbling blocks that Debtors believed they had to overcome to formulate a feasible Plan and that will now enable them to seek and obtain Bankruptcy Court approval of the Plan during the confirmation process.

48. On July 30 and 31, 1991, after an additional two months of arm's-length negotiations on those terms of the Plan that had not been finalized in the Plan Term Sheet, a working draft of the Plan (in almost final form) was furnished to the Courts for their information and distributed to all creditors on the Chapter 11 service list pursuant to Bankruptcy Rule 2002.

49. Only 14 alleged objections, *in toto,* were filed to the Settlement. Of these, only 8 objections were filed by actual members of the Class, having standing to object.

50. The proponents of the Settlement and the SEC Disgorgement Distribution Plan at the hearing consisted of: (i) The Debtors, (ii) the four Official Committees appointed in these Chapter 11 cases, (iii) the four representatives of the Class, and (iv) The Securities and Exchange Commission (the "SEC"). Also appearing were 17 other persons and entities, including four who did not object, six who lacked standing to object as not being members of the Class, five Class members who did not object to the Settlement, *per se,* but to their relative status within the settlement Class, and three Class members who objected to the Settlement *per se.* These latter objectors were (a) joint objectors The Liggett Group and Liquid Green; (b) joint objectors Hart Holding Company and Reeves Industry, Inc.; and (c) William Leighton.

Objectors to their relative status within the Settlement Class included: (a) HongKongBank of London Ltd.; (b) Citibank, Den Danske and Lloyd's Bank, Plc, and Canadian Imperial Bank of Commerce who filed a joint objection; (c) PALCO; (d) Society Bank; and (e) certain plaintiffs in MDL 732 who sought inclusion of future judgment reduction and set-off features in the Settlement.

51. Those who did not object at the hearing included: (a) PLM International, Inc.; (b) First Trust National Bank; (c) American International Group; and (d) Michael Milken (who lacked standing and withdrew objection). Those who lacked standing to object at this time include: (a) Bank of Yugoslavia; (b) Messrs. Godring, Elkins, Weber, Fish, Rosenthal and Spiegel who filed a joint objection; (c) American Bankers Group; (d) twenty partnerships whose joint objection was filed by Sidley & Austin; and (e) Sylvan Schefler.

52. The Settlement permits the Debtors to avoid liquidation under Chapter 7 and almost certainly saves the Debtors' assets for the Class from virtually total depletion

that would be the result of Chapter 7 administrative expenses and a Chapter 7 distress sale.

53. The Mandatory Class, certified for settlement purposes only, consists of all Securities Litigation Claimants who filed timely proofs of claim in the Debtors' Chapter 11 cases and who are listed on Exhibit A or B thereof (or who may be added to either list pursuant to the Settlement including claims listed on Exhibit C). The Mandatory Class includes:

a. the persons who are the named claimants on such proofs of claim;

b. all putative members of the respective classes or other persons or entities whom the named claimants on such proofs of claim purport to represent either as set forth on such proof of claim or in any of the class action Pending Securities Actions against Drexel referred to in the proofs of claim as listed on Exhibit A or B of the Settlement (including any claims which may be added to Exhibit A or B from Exhibit C); and

c. the corporations on whose behalf derivative Pending Securities Actions were brought against any of the Debtors as listed on Exhibit A or B (including any claims which may be added to Exhibit A or B from Exhibit C).

54. The Mandatory Subclasses, certified for settlement purposes only, are Subclass A and Subclass B. Subclass A consists of all Securities Litigation Claimants who filed timely proofs of claim in the Chapter 11 cases of the Debtors and who are listed on Exhibit A (or who may be added to Exhibit A pursuant to the Settlement, including claims listed on Exhibit C).

Subclass A includes:

a. the persons who are named claimants on such proofs of claim;

b. all putative members of the respective classes or other persons or entities whom the named claimants on such proofs of claim purport to represent either as set forth on the proof of claim or in any of the class action Pending Securities Actions against Drexel referred to in the proofs of claim as listed on Exhibit A; and

c. the corporations on whose behalf derivative Pending Securities Actions were brought against any of the Debtors as listed on Exhibit A.

55. Subclass B consists of all securities litigation claimants who timely filed proofs of claim in the Chapter 11 cases of the Debtors and who are listed on Exhibit B (or who may be added to Exhibit B pursuant to the Settlement, including claims listed on Exhibit C). Subclass B includes:

a. the persons who are named claimants on such proofs of claim;

b. all putative members of the respective classes or other persons or entities whom the named claimants on such proofs of claim purport to represent either as set forth on the proof of claim or in any of the class action Pending Securities Actions against Drexel referred to in the proofs of claim as listed on Exhibit B; and

c. the corporations on whose behalf derivative Pending Securities Actions were brought against any of the Debtors as listed on Exhibit B.

56. Fed.R.Civ.P. 23(a)(1)—Numerosity

a. The Mandatory Class satisfies the requirement that the class be "so numerous that joinder of all members is impracticable." The Class is comprised of more than 800 claimants, and includes 37 separate class actions which include tens of thousands of persons. The members of the Mandatory Class are geographically dispersed throughout the United States and elsewhere.

b. It would be impracticable to join all of the claims. Joinder of claims for trial or estimation would, because of their nature, amount and complexity, be impracticable, if not impossible. Individual adjudication of these numerous claims on even a summary estimation basis would take years to complete, would dramatically increase the cost for all of the parties, and would substantially diminish the limited fund of assets of the Debtors' estates and thus impair the very recoveries to which these claimants are entitled.

57. The Mandatory Subclasses satisfy the requirement that the class be "so numerous that joinder of all members is impracticable:"

a. Subclass A is comprised of more than 600 claimants including 13 class actions which include tens of thousands of persons;

b. Subclass B is comprised of more than 165 claimants including 24 class actions which include tens of thousands of persons.

58. The members of the Mandatory Subclasses are geographically dispersed throughout the United States and elsewhere.

It would be impracticable to join all of the claims into a single, meaningful proceeding, for the reasons set forth above with respect to the Class.

59. Fed.R.Civ.P. 23(a)(2)—Common Questions Of Law Or Fact

a. There are questions of law or fact common to the members of the Mandatory Class. All of the members of the Mandatory Class filed proofs of claim against the Debtors and all share common questions of law and fact. These common issues of law and fact include, without limitation:

(1) Whether Drexel is liable under the federal or state securities laws or the common law (*i.e.*, whether Drexel was involved in the issuance, marketing, sale or distribution of the claimants' securities; whether Drexel is culpable);

(2) Whether the members of the Class and Subclasses were damaged thereby; and

(3) What is the relationship between Class members' claims and the claims of other creditors of the Debtors (*i.e.*, whether under the Bankruptcy Code these Class claims are unliquidated and contingent claims; whether the Class and Subclasses should be similarly categorized for bankruptcy purposes; whether the claims have priority over, parity with or are subordinate to other unsecured claims against the Debtors; whether the claims against Drexel must be satisfied from a limited common fund).

60. In addition to the findings relevant to Rule 23(a)(2), which are set forth above

with respect to the Mandatory Class and are equally applicable to the Mandatory Subclasses, the Court finds that members of each of the Subclasses share additional common questions of law or fact with respect to the pooling or non-pooling of their claims.

61. Fed.R.Civ.P. 23(a)(3)—Typicality

a. The claims of the Representative parties of the Mandatory Class are typical of the claims of the members of the Mandatory Class. The Representatives' claims arise from the same events or courses of conduct by the Debtors as the events and courses of conduct from which the other Class members' claims arise. The Class Representatives' legal and remedial theories are similar to those of the absent class members.

b. Among other things, each of the proposed Representatives' claims against the Debtors are of a similar nature and must be satisfied from a common, limited fund. The Representatives and the Class favor obtaining the highest possible recoveries for the Class. The Representatives' interests are squarely aligned with and co-extensive to the interests of the members of the Class.

c. To the extent factual differences may exist with respect to the types of securities involved and the precise causes of action asserted, the nature of the claims asserted by the Representatives of the Mandatory Class are not so unique as to defeat a showing of typicality. While the claims of individual members of the Mandatory Class may differ with respect to the ultimate allocation of such damages, the claims of the Representatives of the Mandatory Class are nevertheless typical.

62. For all the reasons set forth above with respect to the Mandatory Class, the claims of the Representative parties of the certified Mandatory Subclasses are typical of the claims of the members of the Mandatory Subclasses. The claims of the Representatives of Subclass A are typical of the claims of Subclass A because they have the same interest in obtaining recognition of their status as pooled claimants in the allo-

cations between Subclass A and B. Similarly, Subclass B members have the same interest as the Representatives of Subclass B in obtaining a fair allocation of the Settlement proceeds.

63. Fed.R.Civ.P. 23(a)(4)—Adequacy of Representation

a. As to the Mandatory Class, the representative parties fairly and adequately protect the interests of the Class. There is no demonstrable antagonistic interests among the members of the Mandatory Class which would affect the adequacy of representation.

b. The Representative parties and the members of the Mandatory Class have a common interest in establishing that Drexel violated the federal and state securities laws and other laws related to the Class members' purchase, sale or holding of certain securities issued, underwritten, marketed, distributed or sold by Drexel. All of the members of the Mandatory Class seek to establish Drexel's liability and recover damages resulting therefrom.

c. The Representatives adequately represent the interests of all members of the Mandatory Class whether or not such Class members will be entitled to any portion of the Drexel Fund. Regardless of the ability of any member of the Mandatory Class to recover directly from the Drexel Fund, all members of the Mandatory Class, including non-Fund-Eligible Class Members will benefit. To the extent they are Eligible, they will receive a payment, reducing their claim. To the extent they are not Fund–Eligible, they will seek from the Securities Litigation Claimants' share of the Debtors' estates a relatively higher allocation of the proceeds on their unreduced claims.

d. Counsel for the Mandatory Class have the necessary experience, qualifications, resources and competency to represent the class members. All of the attorneys for the Mandatory Class are experienced in class actions and complex commercial and securities litigation. Their experience and competence ensure that the interests of the Mandatory Class have been, and will continue to be, vigorously pursued.

64. For the reasons set forth above with respect to the Mandatory Class, the Representative parties fairly and adequately protect the interests of the Mandatory Subclasses.

65. Fed.R.Civ.P. 23(b)(1)(B)—Limited Fund

a. The prosecution of separate actions by or against individual members of the Mandatory class would create a risk of adjudications with respect to individual members of the Mandatory Class which as a practical matter would be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

b. As shown in the certificate of Peter Gruenberger filed in support of the Application for Approval of the Securities Litigation Claimants Settlement (the "Gruenberger Certificate"), and the affidavits of John F. Sorte, and Richard J. Wright annexed thereto, the assets of the Debtors' Estates constitute a limited fund which is dwindling and which is insufficient to satisfy all claims of the Class members:

(1) The assets of the Debtors' estates are currently valued at approximately $2.4 billion.

(2) Allowed liquidated unsecured claims against the estates currently amount to $2.5 billion.

(3) There are approximately $29–$30 billion face amount of disputed claims against the Debtors' estates.

(4) The face amount of disputed claims filed on or on behalf of members of the Class aggregate in excess of $20 billion.

(5) The limited fund available is insufficient to satisfy the claims of all members of the Mandatory Class, whether the Class claims are viewed as having priority over the liquidated claims, on par with such claims, or subordinate to subclasses.

66. For all the reasons set forth above with respect to the Mandatory Class, the prosecution of separate actions by individual members of the Subclasses would create a risk of adjudication with respect to individual members of the Mandatory Sub-

classes which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

67. Weighing the best interests of the members of the Class and of the Subclasses and the values of the Settlement to said members, it would be inimical to those interests to grant any member leave to opt-out of the Classes and leave to opt-out is denied in the Court's judgment and discretion.

68. Notice:

Notice of the proposed Settlement to members of the Mandatory Class and Subclasses as required pursuant to Fed. R.Civ.P. 23 and due process was sufficient, both as to form and content, to apprise interested parties of the pendency of the Settlement on behalf of the Class and to afford them an opportunity to present their objections.

69. By the Class Order, this Court preliminarily approved the terms of the Settlement embodied in the Agreement dated May 3, 1991, subject to a hearing upon notice to members of the Class.

70. The Court also certified temporarily, for settlement purposes only, the Mandatory Class and the Mandatory Subclasses, pursuant to Bankruptcy Rules 7023 and 9019 and Fed.R.Civ.P. 23(a) and (b)(1)(B).

71. Pursuant to the Class Order, due and sufficient notice was given to the members of the Class and Subclasses, by mail and by publication. The last date for objecting to the Settlement was July 24, 1991.

72. Although the value of the Settlement in total dollars cannot presently be estimated with precision, there is sufficient evidence to demonstrate the values of the Debtors' estates in which the Class will receive percentage interests. As shown in the Weiss, Nemser and Berger Affidavits in support of the Settlement, there is a reasonable prospect that the Debtors' estates could be valued at $1.8–$2 billion or more after deduction of certain fees and expenses. Based upon the Settlement, and assuming a valuation of the estates at $2 billion, the benefit to the Class as a whole would be $810 million, with $607.5 million allocable to Subclass A (not including recoveries under the pooled claims) and $202.5 million allocable to Subclass B (not including certain other benefits attributable to that Subclass).

73. Based upon the findings set forth with respect to a determination that a limited fund exists, the Debtors' assets are sufficiently limited that they would not be able to withstand a greater judgment. The Settlement, with respect to the Class, is fair and reasonable and adequate.

74. The Settlement is likewise fair, reasonable and adequate with respect to both Subclasses A and B. In reaching this conclusion, the Court finds that the Settlement proceeds allocable to Subclass A constitute a fair, reasonable and adequate allocation. The portions allocable to Subclass B constitute a fair, reasonable and adequate allocation to Subclass B.

75. Under the terms of the Settlement and the SEC Plan, Subclass A members will receive 75% of the fixed assets and eligible members of Subclass A will receive 75% of the Drexel Fund (after first setting aside an allocation reserve for certain claims filed after the Bar Date, with approval of the Court). Subclass B members will receive 25% of the fixed assets and eligible members of Subclass B will receive 25% of the Drexel Fund (after setting aside the allocation reserve). Eligible members of Subclass B will also receive any balance remaining in the allocation reserve established under the Drexel Fund. In addition to the foregoing, Subclass B members will receive $15 million, less expenses incurred by counsel in allocating the Settlement funds among Subclass B members. Subclass B members may also receive certain portions of the recoveries to be obtained by Subclass A members in connection with the pooling arrangements.

76. The allocations between Subclasses A and B are fair, reasonable and adequate because:

a. The allocation to each Subclass bears a reasonable relationship to potential maximum recoveries against Drexel, and takes

into account that Drexel would be only partially responsible for the alleged violations; and

b. The allocations were the result of extensive arm's-length negotiations among highly experienced counsel, who considered all relevant factors, including the following: (a) that Subclass A members were required to pool their claims with the Debtors' similar claims and to share recoveries thereunder, both *inter se* and with the Fixed Creditors, (b) that the values of the claims asserted by Subclass A members, including the individual, class and derivative claims and the claims of the FDIC and RTC, exceeded the monetary amounts in the claims asserted by Subclass B.

77. The Settlement is fair notwithstanding that the actual amounts to be distributed to class members will be subject to further allocation procedures within each of the Subclasses.

78. The allocation procedures will protect the interests of each of the Subclass members. Moreover, the procedures will govern distributions not only from the fixed assets, but also from the Drexel Fund and will be subject to further Court approval. Thus adequate safeguards exist to provide that Subclass A and Subclass B members will be fairly and adequately compensated out of Drexel's assets.

79. The fact that some Subclass members are eligible to participate in the Drexel Fund, while others are not, does not affect the reasonableness of the Settlement or create a conflict among the Subclass members. The representatives of the Subclasses acted on behalf of all members of the Subclasses. The immediate funding of the Drexel Fund and obtaining of benefits for Securities Litigation Claimants served the best interests of and satisfied claims of all the Class members. That a Class member would not participate in the Drexel Fund may be considered in determining such Class members share of the fixed assets.

80. The Settlement is reasonable in light of the complexity, expense and likely duration of the litigation. Litigation through estimation procedures and appeals would be wasteful, needlessly expensive and could substantially reduce the amounts available for Settlement. In addition, the risks inherent in conversion of these Chapter 11 cases to a liquidation pursuant to Chapter 7 further supports the reasonableness of the Settlement.

81. The Settlement is fair, reasonable and adequate in light of the risks involved in establishing liability, damages and in maintaining a class action through trial. The risks include:

a. the estimation and capping procedures contemplated herein might resolve Class members' claims against the Debtors at levels far below the amounts to which they believe they would be entitled with no capping, and with full discovery and a plenary trial;

b. the fact that the full funding of the Drexel Fund was at risk by virtue of the claims of other creditors that such funding was improper;

c. the risk of a possible conversion of these bankruptcy cases to a Chapter 7 liquidation proceeding could adversely affect the eventual recoveries available for Securities Litigation Claimants; and

d. imposition of the automatic stay and the extension of the stay to non-Debtor personnel have created potential risks in prosecuting the claims not only against the Debtors but also in ongoing actions against third parties.

82. The Court finds that risks are generally inherent in litigation, particularly in complex claims such as these.

83. The Settlement was negotiated with knowledge of the strengths and weaknesses of the litigations involved.

84. The affidavits of Weiss, Nemser and Berger and the certificate of Gruenberger, establish that the Representatives of the Mandatory Class had extensive negotiations with the Debtors and the Fixed Creditors over many months. Substantial financial information was provided to the said representatives with respect to the status of the Debtors' assets. In addition, extensive discovery has been ongoing, involving countless documents and numerous depositions in many of the contingent class and derivative actions. Counsel for the Class

have received access to essential discovery taken in connection with a Rule 2004 examination. Under the circumstances, the Class representatives had sufficient information to assess whether the Settlement was fair, reasonable and adequate.

85. For all the reasons set forth above with respect to the Mandatory Class, the Settlement on behalf of the Subclasses was negotiated with knowledge of the strengths and weaknesses of the litigations involved.

86. The virtual absence of negative response to the Class members supports approval of the Settlement.

87. For the reasons set forth above with respect to the Mandatory Subclasses, the absence of any substantial negative response of the members of the Subclasses supports approval of the Settlement. No Subclass A members have objected on the basis that the Settlement is not fair, reasonable and adequate. Only eight objections to any portion of the Settlement were filed by members of Subclass B.

## CONCLUSIONS OF LAW

### I.

### MANDATORY CLASS CERTIFICATION AND SETTLEMENT PRINCIPLES

■ A. Only Class members have standing to object to the Settlement of a class action.[6]

1. The rights and interests of non-settling parties are not affected by the Settlement.[7]

2. Objectors who are non-Class members lack standing to object to the fairness, reasonableness and adequacy of the Settlement.[8]

■ B. Rule 23(a) Requirements for Class Treatment are Satisfied. The evidence on the record amply demonstrates that:

1. The Class and Subclasses are so numerous that joinder of all members is impracticable.[9]

2. There are questions of law and fact common to members of the Class and Subclasses.[10]

3. The Claims of the Class Representative parties are typical of the claims of the Class.[11]

4. The Representatives will fairly and adequately protect the interests of the Class and Subclasses.

    a. The interests of the Class are not antagonistic to the interests of the Class members.[12]

    b. Counsel for the Subclasses are qualified, experienced and able to conduct the litigation.[13]

C. Mandatory Class Certification Pursu-

**6.** *In re Union Carbide Corp. Consumer Products Securities Litigation,* 718 F.Supp. 1099, 1108 (S.D.N.Y.1989); *In re Viatron Computer Systems Corp. Litigation,* 614 F.2d 11, 14 (1st Cir.), *cert. denied,* 449 U.S. 826, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980); *In re A.H. Robbins Co.,* 85 B.R. 373, 378 (E.D.Va.1988), *aff'd,* 880 F.2d 709 (4th Cir.1989); *In re Beef Industry Antitrust Litigation,* 607 F.2d 167, 172 (5th Cir.1979), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981).

**7.** *In Re Beef Industry Antitrust Litig.,* 607 F.2d 167, 172 (5th Cir.1979).

**8.** *In Re Fine Paper Litig.,* 632 F.2d 1081, 1087 (3d Cir.1980); *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 754 (S.D.N.Y.1985), *aff'd,* 798 F.2d 35 (2d Cir.1986).

**9.** *See e.g., Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972); *Krome v. Merrill Lynch & Co.,* 637 F.Supp. 910, 920 (S.D.N.Y.), *modified on other grounds,* 110 F.R.D. 693 (S.D.N.Y.1986).

**10.** *See e.g., Northwestern National Bank v. Fox & Co.,* 102 F.R.D. 507, 511 (S.D.N.Y.1984); *Blackie v. Barrack,* 524 F.2d 891, 902–05 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *See Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 914 (9th Cir.1964).

**11.** *See e.g., Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Ohman v. Kahn,* [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,359 at 96,-744, 1990 WL 97756 (S.D.N.Y. June 27, 1990).

**12.** *Eisen,* 391 F.2d at 562; *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1413 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir. 1990).

**13.** *Id.*

ant to Fed.R.Civ.P. 23(b)(1)(B) is Appropriate.[14]

1. The existence of a limited fund which is insufficient to satisfy the claims of potential claimants constitutes grounds for certification of a Mandatory Class under Fed.R.Civ.P. 23(b)(1)(B).[15]

2. The use of a Mandatory Class pursuant to Fed.R.Civ.P. 23(b)(1)(B) for Settlement purposes is amply supported in precedent.[16]

3. Certification of a non-opt-out Settlement Class as a threshold for a Class Settlement hearing is entirely proper.[17]
   a. Notice of the Settlement and hearing thereon is required so as to allow the Class members an opportunity to object to the fairness, reasonableness or adequacy of the Settlement.[18]

4. Objectors to the certification of the Class and Subclasses must be and have been given an opportunity to challenge the existence of a limited fund.[19]

■■■ D. Notice of the certification of the Class and the proposed Settlement given here fully complied with the requirements of due process and Fed.R.Civ.P. 23.[20]

1. Simultaneous notice to Class and Subclass members of the pendency of the Class action and the terms of a proposed settlement is permissible.[21]

2. The notice fairly, accurately and neutrally apprised prospective Class and Subclass members of the terms of the Proposed Settlement, the identity of persons entitled to participate in it and the options that are open to the Class and Subclass members in connection with the proceedings.[22]

■■■ E. The Court, in the exercise of informed judgment and discretion has the authority to grant or deny any Class member's application to opt out of a mandatory class; and the Court determines that no opt-out of any member be permitted, and has exercised its discretion accordingly.[23]

## II.

## THE SETTLEMENT SATISFIES Fed.R.Civ.P. 23 UNDER THE *Weinberger* STANDARD [24]

■■■ A. Courts should approve a class settlement if it falls within a range of reasonableness which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in carrying any litigation to completion.[25]

■■■ B. The Court must apprise itself of the facts necessary for an informed, intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.[26]   Additionally:

1. The negotiation process must be the result of arm's-length negotiations;

2. Class counsel must possess the necessary experience, ability and grasp of

**14.** See In re Joint Eastern and Southern District Asbestos Litigation, 1991 WL 116967 at * 112–17 (E.D.N.Y.1991).

**15.** See e.g., In re A.H. Robins Co., 880 F.2d 709, 741 (4th Cir.1989); In re Joint Eastern and Southern Dist. Asbestos Litig. (WL) at * 113.

**16.** See e.g., County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295 (2d Cir.1990).

**17.** See e.g., In re Bendectin Products Liability Litigation, 102 F.R.D. 239, 240 (S.D.Ohio 1984).

**18.** See e.g., Weinberger v. Kendrick, 698 F.2d 61, 71 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

**19.** In re Temple, 851 F.2d 1269, 1272 (11th Cir. 1988), In re Northern District of California Dal-

kon Shield IUD Products Liability Litigation, 693 F.2d 847, 857 (9th Cir.1982).

**20.** See Weinberger, 698 F.2d at 69–73.

**21.** See id.

**22.** See id. at 70–71.

**23.** See County of Suffolk v. Long Island Lighting Co., 907 F.2d at 1302–05.

**24.** Weinberger, 698 F.2d at 73.

**25.** Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); In re Joint Eastern and Southern Dist. Asbestos Litig., (WL) at * 140.

**26.** Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); Weinberger, 698 F.2d at 74.

the facts for effective representation of the class' interests.[27]

■ C. A higher degree of judicial scrutiny is required where a settlement is negotiated before final certification of a class.[28]

■ D. A sufficient factual record exists in support of approval of the Settlement.

1. The parties have submitted sufficient evidentiary data necessary to assess the fairness, reasonableness and adequacy of the Settlement.

2. The Settlement was the result of extensive arm's-length negotiations.[29]

3. The Court may take judicial notice of additional facts from:

    a. The record of the prior proceedings of these Chapter 11 cases, including:

        (1) The record established in proceedings before the Bankruptcy Court; and

        (2) The record established in proceedings before the District Court, commencing with the Debtors' motion to withdraw the reference of jurisdiction from the Bankruptcy court for purposes of estimating and capping the Securities Litigation Claims, dated October 26, 1990, and continuing in numerous hearings and status conferences between November, 1990 and today.

    b. The record in other proceedings before the Court, including:

        (1) The SEC Action; and

        (2) *In re Ivan F. Boesky Securities Litigation*, MDL Dkt. No. 732 (MP) (S.D.N.Y.1987).

■ E. The Settlement satisfies the factors that guide a Court to a determination that the class settlement satisfies Rule 23(e).

1. The Settlement is fair, reasonable and adequate in light of the complexity, expense and likely duration of litigation.[30]

2. The absence of objections from the vast majority in response to notice to the Class members may be given consideration in approving the Settlement.[31]

3. The Settlement is reasonable in light of the risks involved in establishing liability, damages, and in maintaining the Class action through trial.[32]

4. The Debtors' available assets and their inability to withstand a greater judgment lends further support to the finding of fairness, reasonableness and adequacy.[33]

    a. It is not an impediment to approval of the Settlement that the actual amounts to be distributed to Class members will be subject to further allocation procedures within each of the Subclasses.[34]

5. The opinion of Counsel that the Settlement is fair, reasonable and adequate is relevant in reaching the Court's determination.[35]

6. The Settlement was negotiated with informed knowledge of the strengths and weaknesses of the claims in-

---

**27.** *Weinberger,* 698 F.2d at 74.

**28.** *Id.* at 73.

**29.** *See id.* at 74.

**30.** *See Anderson,* 390 U.S. at 424–25, 88 S.Ct. at 1163–64; *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977) *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

**31.** *Josephson v. Campbell,* [1967–1969 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,347 (S.D.N.Y. January 24, 1969) at 97,658.

**32.** *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

**33.** *Id.* at 455; *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

**34.** *In re Agent Orange Product Liability Litigation,* 818 F.2d 145, 170 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988); *In re Washington Public Power Supply System Securities Litigation,* [1988 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,326, 1988 WL 158947 (W.D.Wash.1988).

**35.** *Weinberger,* 698 F.2d at 74; *Republic National Life Insurance Co. v. Beasley,* 73 F.R.D. 658, 668 (S.D.N.Y.1977) (Pollack, J.).

volved.[36]

F. The terms of the Settlement contain customary judgment reduction provisions that preserve non-settling defendants' rights without prejudicing the rights of settling claimants or absent Class members.[37]

## III.

## THE SETTLEMENT SATISFIES ALL PROCEDURAL REQUIREMENTS OF FEDERAL BANKRUPTCY LAW

■ A. Notice To All Creditors At This Time Was Unnecessary

1. Bankruptcy Rules 9019, 2002 and 7023 grant the Court wide discretion as to which creditors are to receive notice and how.[38] Only Class members need receive notice of the hearing on the fairness of the Settlement.

2. Creditors who are not Class members will receive appropriate notice with respect to Plan confirmation issues during proceedings attendant to confirmation of the Plan.

B. A Sufficient Factual Record Exists In Support Of Approval Of The Settlement

## IV.

## THE SETTLEMENT COMPLIES WITH ALL APPLICABLE SUBSTANTIVE PROVISIONS OF FEDERAL BANKRUPTCY LAW

■ A. Settlement Of The Securities Litigation Claims Is The Preferred Alternative To Individual Estimations

1. Under principles of bankruptcy law, there are two alternate methods for

resolving the Securities Litigation Claims—estimation or settlement.[39]

2. Settlement is the more appropriate method of resolving the Securities Litigation Claims.[40] Estimation would unduly delay the resolution of these Chapter 11 cases, possibly for years, deplete the assets of these estates, and consume substantial resources of the judiciary.

B. The Settlement Is Not a "De Facto" Plan Of Reorganization, But Is A Distinct Agreement, Representing A Necessary Building Block Of The Plan.

1. The Settlement Is Not A *De Facto* Plan.

a. The Settlement contained in the Agreement is separate and distinct from the Plan. Both the Settlement and Plan exist, and each must receive separate judicial approval.

b. Here, the Settlement does not propose a forced distress sale of all or substantially all of the assets of these estates pursuant to section 363 of the Bankruptcy Code.[41] Rather, pursuant to Fed.R.Civ.P. 23 and Bankruptcy Rules 9019 and 7023, the Settlement effectively resolves the multi-billion dollar claims of the Securities Litigation Claimants.[42]

c. By conclusively resolving the Securities Litigation Claims, the Settlement eliminates one of the most significant hurdles standing in the way of resolution of these Chapter 11 cases. In the absence of the Settlement, there could be no Plan and indeed, no successful and prompt resolution of these Chapter

**36.** *Grinnell Corp.*, 495 F.2d at 463; *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975).

**37.** *Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990); *In re School Asbestos Litigation*, 921 F.2d 1330, 1333 (3d Cir. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

**38.** *9 Collier on Bankruptcy* ¶ 9019.03[1] at 9019-3 (1990).

**39.** *See* Bankruptcy Rule 9019(b); Bankruptcy Rule 7023 (incorporating Fed.R.Civ.P. 23); 11 U.S.C. § 502(c) (1979).

**40.** *See e.g., In re Tavern Motor Inn, Inc.*, 56 B.R. 449, 453 (Bankr.D.Vt.1985).

**41.** *Compare In re Braniff Airways, Inc.*, 700 F.2d 935, 942 (5th Cir.1983); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 982–85 (Bankr. N.D.N.Y.1988) *with In re Flight Transportation Corp.*, 730 F.2d 1128, 1134–35 (8th Cir.1984), *cert. denied*, 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985); *In re Lion Capital Group*, 49 B.R. 163, 177 (Bankr.S.D.N.Y.1985).

**42.** *See e.g., In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 884–85 (Bankr.S.D.N.Y.1990).

11 cases. Thus, rather than a *de facto* plan, the Settlement is the necessary first step toward confirmation of the Plan.[43]

2. The Settlement And Plan Term Sheet Do Not "Lock Up" The Terms Of The Plan.

a. The Settlement, which sets forth the requisite elements to be contained in the Plan, does not "lock up" the terms of the Plan because:

(1) the Settlement is conditioned upon confirmation of the Plan; and

(2) non-class creditors and interest holders will be entitled to voice their objections to the Plan in connection with the confirmation process, notwithstanding approval of the Settlement.

■■■■■ C. The Settlement, Being Fair, Reasonable And Adequate, Meets The Applicable Bankruptcy Standard.

1. Fed.R.Civ.P. 23 principles control the Settlement.

2. If bankruptcy principles apply at all, the standards for approval of settlements in the bankruptcy context have been satisfied because the Settlement is fair and does not "fall below the lowest point in the range of reasonableness".[44]

3. The Settlement is well within the range of reasonableness after consideration of the following factors: (i) the probabilities of litigation success; (ii) the difficulties of collecting any litigated judgments; (iii) the complexity of the litigation and the expense, inconvenience and delay necessarily attend-

ing it; and (iv) the paramount interests of the creditors and interest holders of the estate.[45]

4. The second and third factors are clearly satisfied; no one has objected on those grounds. The first and fourth are also satisfied for the following reasons:

a. The Probability Of Success

(1) Approval of a settlement does *not* require a "mini-trial" on the merits;[46] the Court need only canvass the issues.[47]

(2) Given the enormous procedural complexities and the financial condition of the Debtors, based upon the entire record in these Chapter 11 cases, the Settlement is fair, reasonable and adequate to all Class members.

b. Because It Avoids Both Undue Litigation And The Prospect Of Liquidation, The Settlement Is In The Best Interests Of The Creditors And Interest Holders Of These Estates

(1) Litigation of the complex and numerous Securities Litigation Claims threatens to erode the Debtors' remaining assets at an accelerating rate and eliminate the possibility of a successful reorganization.[48]

(2) The Settlement provides for the best possible realization upon the Debtors' available assets without undue waste or needless or fruitless litigation.

(3) Liquidation, the proposed alternative to the Settlement and reorganization, would result in the litigation of

**43.** *Id.,* at 886, 888–90; *In re Lion Capital Group,* 49 B.R. at 177.

**44.** *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.), *cert. denied, sub nom. Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *see, In re Teltronics Serv., Inc.,* 762 F.2d 185, 189 (2d Cir.1985); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968).

**45.** *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir. 1929); *In re Lion Capital Group,* 49 B.R. at 175; *In re Carla Leather, Inc.,* 44 B.R. 457, 466 (S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y.1985).

**46.** *W.T. Grant Co.,* 699 F.2d at 608; *In re Blair,* 538 F.2d 849, 851–52 (9th Cir.1976); *In re International Distrib. Centers, Inc.,* 103 B.R. 420, 423 (S.D.N.Y.1989); *In re Tampa Chain Co., Inc.,* 70 B.R. 25, 26 (S.D.N.Y.1987).

**47.** *Teltronics Serv.,* 762 F.2d at 189 *quoting W.T. Grant Co.,* 699 F.2d at 608. *See e.g., In re Lion Capital Group,* 49 B.R. at 175.

**48.** *See e.g., In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. 982, 997–99 (Bankr.D.Minn.1989); *In re Arrow Air, Inc.,* 85 B.R. 886, 892 (Bankr. S.D.Fla.1988).

the vast number of Securities Litigation claims and the prompt disposition of Debtors' illiquid assets at forced, distress values which would probably leave little to be distributed to any creditor.

D. The Release And Injunction Provisions Of The Settlement Are In The Best Interests Of The Debtors And Creditors.

1. Providing releases to and injunctions concerning non-Debtors is permissible where a material benefit results to the Debtors' estates and advances consummation of a Plan.[49]

2. The material benefits here involve:
a. The continued cooperation of the Debtors' ongoing employees in prosecuting pooled claims;
b. An incentive to third parties to settle, resulting in increased amounts to be received by all Class members, although in different amounts;
c. Elimination of competition for the Drexel and Milken Funds by preventing Fixed Creditors from making claims thereto;
d. By the releases, protection of the Debtors' estates from piecemeal dismemberment through claims over and other indemnity claims.

## V.

THE OBJECTIONS THAT IMPLICATE PLAN CONFIRMATION ISSUES OF THOSE WHO APPEARED ARE REJECTED NOW AS MERITLESS, AND FOR THOSE LACKING STANDING, CONSIDERATION OF OBJECTIONS ARE DEFERRED UNTIL THE PLAN CONFIRMATION PROCESS

A. Claimants In The Settlement Class Are Not Impaired.

1. A class of creditors is not impaired if a plan of reorganization "leaves unaltered the legal, equitable, and contractual rights to which such claim ... entitles the holder of such claim...." 11 U.S.C. § 1124(1).[50]

2. If finally approved, the Settlement establishes the legal, equitable and contractual rights of all Class members regarding the Debtors.

3. The Plan gives this Class precisely the consideration the Settlement establishes to be the collective rights of the Class, thereby leaving the Class unimpaired.

B. Different Treatment Is Properly Accorded Subclasses A And B Under The Settlement, While The Plan Properly Accords The Class Identical Treatment.

1. Fed.R.Civ.P. 23(c)(4)(B) permits the establishment of Subclasses A and B, who are to be treated differently for purposes of the Settlement.[51]

2. For purposes of the Plan, which does not affect the settled rights of any Class member, all Class members are unimpaired and treated alike.

3. Fixed Creditors are properly classified and treated differently from Class members under the Plan because the Fixed Creditors are impaired thereunder.[52]

C. The Debtors' Contingent Claims Are Not Improperly Assigned, Rather They Would Be Properly Prosecuted By Validly Appointed Representatives of the Estates.

1. Pooling of claims by Debtors and certain Securities Litigation Claimants benefits the Debtors' estates as it avoids multiple parties competing against common defendants.

**49.** *See e.g., In re A.H. Robins Co.,* 880 F.2d 694, 701 (4th Cir.) *cert. denied,* —— U.S. ——, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *In re AOV Indus., Inc.,* 792 F.2d 1140, 1152 (D.C.Cir.1986); *In re Johns–Manville Corp.,* 68 B.R. 618, 624–27 (Bankr.S.D.N.Y.1986).

**50.** *See e.g., In re Tavern Motor Inn, Inc.,* 56 B.R. 449, 453 (Bankr.D.Vt.1985); 5 *Collier on Bankruptcy,* ¶ 1124.03[1].

**51.** *Manual for Complex Litigation (Second)* § 30.16 at 216 (1985); 3B *Moore's Federal Prac-*
tice § 23.65 at 23–474 (2d 1985); *see e.g., In re Broadhollow Funding Corp.,* 66 B.R. 1005, 1010 (Bankr.E.D.N.Y.1986); *In re Home–Stake Prod. Co. Sec. Litig.,* 76 F.R.D. 351, 376–77 (N.D.Okla. 1977).

**52.** *See e.g., In re Jersey City Medical Center,* 817 F.2d 1055, 1061 (3d Cir.1987); *In re Meadow Glen, Ltd.,* 87 B.R. 421, 424 (Bankr.W.D.Tex. 1988).

 

2. Pursuant to the Plan, prosecution of such pooled claims will be accomplished by appropriately appointed representatives of the estates as permitted under section 1123(b)(3)(B) of the Bankruptcy Code.[53]

D. Consideration Of Issues On Behalf Of Those Now Lacking Standing Which Relate To Confirmation Of The Plan Is Premature At This Juncture.

1. It is premature to decide Plan Confirmation issues by any who lack standing at this time. These will be addressed and resolved later during the Plan confirmation process,[54] including:

a. The non-impairment of the settled rights of the Class members under the Plan;

b. Satisfaction of the requirements of section 1123(a)(4) of the Bankruptcy Code with respect to the treatment of the settled Class under the Plan;

c. The fact that the Plan is not being confirmed as a "cram down" pursuant to section 1129(b) of the Bankruptcy Code but rather is being confirmed under section 1129(a); and

d. The fact that the Plan properly appoints representatives of the Debtors' estates to pool and prosecute certain of the Debtors' contingent claims together with claims of such representatives.

## VI.

The mandatory non-opt-out classes, the Settlement, and the SEC Amended Plan of Distribution of the Disgorgement (Drexel) Fund are approved.

SO ORDERED.

---

**53.** *In re Sweetwater,* 884 F.2d 1323, 1326 (10th Cir.1989); *In re Kroh Bros. Dev. Co.,* 101 B.R. 1000, 1005 (W.D.Mo.1989); *In re Amarex, Inc.,* 96 B.R. 330, 334 (W.D.Okla.1989).

**54.** *See e.g., In re Monroe Well Service, Inc.,* 80 B.R. 324, 335–36 (Bankr.E.D.Pa.1987).