McLAUGHLIN, Circuit Judge:
Appellants are three members of a proposed class of plaintiffs that have asserted claims against defendants-appellees Drexel Burnham Lambert Group, Inc. and its subsidiaries (collectively “Drexel”). Appellants ask us to reverse an order entered in the United States District Court for the Southern District of New York (Milton Pollack, Senior District Judge) certifying the proposed class and two subclasses, and approving a settlement agreement (the “Settlement Agreement”) of the class’ claims. We find that the district court did not err in certifying the class and subclasses and in approving the Settlement Agreement, and therefore affirm.
BACKGROUND
The events causing the demise of Drexel are well-documented, and need not be recounted here. We summarize only the facts that are necessary to understand the dispute before us.
In September 1988, the Securities and Exchange Commission (“SEC”) filed a civil *288 enforcement action against Drexel and several of its top-ranking officials, alleging that Drexel had violated federal law in various securities transactions. After intense negotiations, Drexel agreed to create a $350 million fund to be administered by the SEC (the “SEC Fund”) in exchange for dismissal of the complaint. The SEC was to distribute the Fund to the victims of Drexel’s illegal transactions in “junk bonds.”
Drexel paid $200 million into the SEC Fund in September 1989, and agreed to pay the remaining $150 million in two installments over the next three years. However, in February 1990 (before Drexel had paid any of the remaining $150 million), Drexel filed a petition for relief under 11 U.S.C. § 1101, et seq., in the Bankruptcy Court for the Southern District of New York. The SEC immediately filed a bankruptcy claim for the remaining $150 million Drexel owed the SEC Fund. Many other potential claimants followed suit, and by November 1990, over 15,000 bankruptcy claims had been filed against Drexel. Among these claims, 850 arose out of Drex-el’s actions in buying, selling and underwriting securities (the “Securities Claims”).
To facilitate settlement, Judge Pollack withdrew the Securities Claims from the bankruptcy court pursuant to 28 U.S.C. § 157(d).[1] Early attempts to settle each claim individually proved fruitless. Thus, the district court ordered the establishment of the Securities Litigation Claimants Group (“SLCG”), comprising the Federal Deposit Insurance Corporation (“FDIC”), the Resolution Trust Corporation (“RTC”), and two groups of claimants in other securities-related actions against Drexel. One group consists of claimants in various derivative suits brought against Drexel (the “Derivative Plaintiffs”). The other group consists of claimants who brought actions against Drexel that were later consolidated before Judge Pollack by the Panel on Mul-tidistrict Litigation (the “Boesky Litigation Plaintiffs”). See In re Ivan F. Boesky Securities Litigation MDL Dkt. No. 732 (MP). The SLCG’s mission was to negotiate with Drexel and Drexel’s non-securities claimants (the “Fixed Creditors”) to settle all claims against Drexel.
The parties negotiated throughout January and February. On February 18, 1991, the SLCG advised the district court that the parties had agreed to the broad framework of a settlement. The parties then engaged in round-the-clock negotiations over the next three months to flesh out the terms of the settlement.
On May 3, 1991, the parties arrived at the Settlement Agreement at issue here, an agreement as intricate as it is lengthy. It contains thirty-three single-spaced pages painstakingly describing the settlement method. The Agreement requires the 850 securities claimants to be certified as a mandatory, non-opt-out class, which in turn is divided into two subclasses. The principal members of subclass A include several failed banks currently administered by the FDIC or the RTC, and the Derivative Plaintiffs. Subclass B consists primarily of the Boesky Litigation Plaintiffs.
Under the Settlement Agreement, Drexel must pay the $150 million balance it owes the SEC Fund. The $350 million SEC Fund will then be divided between the subclasses, with subclass A receiving seventy-five percent ($262.5 million) and subclass B twenty-five percent ($87.5 million). The entire class will also receive a share of Drex-el’s remaining assets (the “Class Assets”), which will be divided between the subclasses in the same 75%-25% ratio as the SEC Fund. Subclass A’s total recovery from the SEC Fund and the Class Assets is estimated at $600 million, while subclass B’s total recovery is estimated at $200 million. Finally, the Settlement Agreement provides for subclass A and Drexel to “pool” their recovery from lawsuits they *289 have brought against Drexel’s former directors and officers (the “Pooled Recovery”).[2] The Settlement Agreement does not contain any provision enabling subclass B to share in the Pooled Recovery, and enjoins members of subclass B from bringing any future actions against the directors and officers.
The district court scheduled an August 9, 1991 hearing on the fairness of the Settlement Agreement. Notice of the hearing was sent to each of the securities claimants, and was published in six different newspapers throughout the United States. Only eight of the 850 proposed class members filed objections. After listening to their challenges, the district court issued an order certifying the class and approving the Settlement Agreement.
Three of the eight objecting class members now appeal from the district court’s order. Appellants first contend that the district court erred in certifying the mandatory non-opt-out class and subclasses. Second, they maintain that the district court erroneously approved the Settlement Agreement. We reject both arguments, and thus affirm the order of the district court.
DISCUSSION
I. Appealability
Drexel has moved to dismiss this appeal, claiming that the district court’s order is not final. In support of its motion, Drexel points to the district court’s order, which states:
By conclusively resolving the Securities Litigation Claims, the Settlement eliminates one of the most significant hurdles standing in the way of resolution of these Chapter 11 cases. In the absence of the Settlement, there could be no [reorganization] Plan and indeed, no successful and prompt resolution of these Chapter 11 cases.
[[Image here]]
[However, t]he Settlement, which sets forth the requisite elements to be contained in the [reorganization] Plan, does not “lock up” the terms of the Plan because ... the Settlement is conditioned upon confirmation of the Plan_
In re Drexel Burnham Lambert Group, Inc., 130 B.R. 910, 926, 927 (S.D.N.Y.1991) [“Drexel /”] (emphasis added). Because the district court acknowledged that the Settlement Agreement is “conditioned upon confirmation” of Drexel’s reorganization plan, Drexel argues that the district court’s order approving the Settlement Agreement is not final. We disagree.
While Drexel’s point might be well-taken in the ordinary realm of civil litigation, it must be emphasized that this appeal arises in a bankruptcy context. We have traditionally accorded a more flexible definition to concepts of finality and appealability in bankruptcy cases. In re Sonnax Industries, Inc., 907 F.2d 1280 (2d Cir.1990). As we noted in Sonnax, a looser standard of appealability is necessary because:
a bankruptcy proceeding is umbrella litigation often covering numerous actions that are related only by the debtor’s status as a litigant and that often involve decisions that will be unreviewable if appellate jurisdiction exists only at the conclusion of the bankruptcy proceeding.
Id. at 1283 (citations omitted). We held in Sonnax that an order in a bankruptcy case is appealable if the order “finally disposes of [a] discrete dispute [ ] within the larger case.” Id. (emphasis in original) (citations omitted). There is no question that the order approving the Settlement Agreement addresses a “discrete dispute;” as the district court noted, the Settlement Agreement conclusively resolves the Securities Claims. See Drexel I, 130 B.R. at 926. Our inquiry focuses on the first prong of the Sonnax test: whether the order “finally disposes” of the Securities Claims.
*290 Under Sonnax, our determination of the finality of the district court’s order depends on whether appellants will have another chance to assert their objections to the Settlement Agreement. After careful scrutiny, we find that appellants will not have that second chance. They will be unable to participate further in Drexel’s reorganization proceedings.
The bankruptcy code allows a claimholder to participate in a debtor’s reorganization plan if the claimholder’s interests are “impaired” by the plan. 11 U.S.C. § 1126(f). If the claimholder’s interests are “unimpaired,” the claimholder is “conclusively presumed to have accepted the plan,” and his participation in or approval of the reorganization plan is not necessary for the plan to gain confirmation by the bankruptcy court. Id. A claimholder’s interests are “unimpaired” if the reorganization plan “leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder....” Id. § 1124(1).
Here, the district court found that Drex-el’s reorganization would not alter or otherwise infringe the class members’ rights, and that the Settlement Agreement “estab-lishe[d] the legal, equitable and contractual rights of all [e]lass members” regarding Drexel. Drexel I, 130 B.R. at 928. Thus, the court held that the class members were “unimpaired” within the meaning of 11 U.S.C. § 1124(1). Accordingly, because appellants are “unimpaired” claimants, they will be unable to participate in Drexel’s reorganization proceedings. It follows that the order approving the Settlement Agreement finally disposes of appellants’ claims, and we may address appellants’ objections to the Settlement Agreement.
II. Class Certification
In determining whether a class should be certified, a district court must first consider each of the factors set forth in Fed.R.Civ.P. 23(a):
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
If each element of Rule 23(a) is satisfied, the district court must then determine whether class certification is appropriate under Fed.R.Civ.P. 23(b). We will overturn a district court’s decision to certify a class only if the district court abused its discretion. E.g., Johnpoll v. Thornburgh, 898 F.2d 849, 852 (2d Cir.1990). We hold that the district court certified the class in accordance with Rule 23(a) and (b), and thus affirm the class certification.
A. Rule 23(a)
1. Impracticability of Joinder
The proposed class is clearly so numerous that joinder is impracticable. The entire class comprises nearly 850 claimants dispersed throughout the United States. Subclass A consists of more than 600 claimants, while subclass B consists of over 160 claimants. Individual adjudication of each claim would take many years, and would drastically increase the legal expenses for all of the parties. Joinder of all claims into one proceeding would be expensive, time-consuming, and logistically unfeasible. Thus, Rule 23(a)(1) has been satisfied.
2. Common Questions of Law or Fact
As the district court noted, there are several questions that are common to each class and subclass member. Among these questions are:
1) Whether Drexel is liable under federal or state securities laws for its role in buying, selling and underwriting securities to the putative class and subclasses;
2) Whether the putative class and subclass members were damaged by Drexel’s conduct;
3) The status of the putative class and subclass members’ claims relative to the claims of Drexel’s Fixed Creditors.
See Drexel I, 130 B.R. at 919. There is nothing in the record to persuade us that *291 these common questions do not exist. Accordingly, Rule 23(a)(2) has been met.
3. Typicality
Rule 23(a)(3) is satisfied when each class member’s claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant’s liability. See Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968), vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Charles A. Wright, et al., 7A Federal Practice & Procedure § 1764 at 243 (1986). Here, each class member’s claim is based on Drexel’s purported violations of securities laws. Each claim must be satisfied from a limited fund of assets. Members of the subclasses share an interest in establishing Drexel’s liability for violations of federal and state law, and achieving the maximum amount of recovery for their particular subclass.
Despite this strong showing of typicality, appellant Liggett Group Inc. (“Liggett”) challenges the district court’s finding. Lig-gett points out that it is ineligible to share in the distribution of the SEC Fund because its claims against Drexel do not arise from transactions involving junk bonds, but rather are based solely on Drexel’s allegedly fraudulent sale of commercial paper to Liggett. Thus, Liggett argues that its claims are not typical of other members of subclass B, who may draw from both the SEC Fund and the Class Assets. Essentially, Liggett fears that because it cannot share in the SEC Fund it will obtain a lesser recovery than other members of subclass B. We find that Liggett’s qualms are premature.
The Settlement Agreement earmarks twenty-five percent of both the SEC Fund and the Class Assets for subclass B, as a whole. The Agreement does not require that each subclass member receive the same percentage as his fellow subclass members from the SEC Fund and the Class Assets. Indeed, the Agreement does not address the rights of individual subclass members. Moreover, the Settlement Agreement does not provide for immediate distribution of the subclass’ recovery to individual subclass members. Actual distribution will occur only after Drexel’s reorganization is completed, and will be supervised by the district court. At that time, Liggett can seek a higher percentage of the Class Assets to compensate for its inability to share in the SEC Fund. Accordingly, we reject Liggett’s argument that the Settlement Argument manifests a lack of typicality within the class.
4. Adequacy of Representation
Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be “qualified, experienced and generally able” to conduct the litigation. Second, the class members must not have interests that are “antagonistic” to one another. See Eisen, 391 F.2d at 562. Appellants do not dispute that the first prong of the Eisen test has been met. They focus their attack on the second prong, arguing that their interests substantially conflict with the rest of subclass B. Again, we disagree.
Aside from Liggett’s flawed argument that it will necessarily obtain a smaller recovery than other subclass B members, appellants have not offered any proof that their interests are antagonistic to the remainder of subclass B. To the contrary, the record unequivocally indicates that all members of subclass B (including appellants) share a common interest in showing that Drexel violated federal and state securities laws. All members of subclass B similarly wish to obtain the highest possible recovery for that subclass. In the absence of a showing of a genuine conflict between appellants and subclass B, we reject appellants’ argument that Rule 23(a)(4) has not been satisfied.
B. Rule 23(b)
Having found that the prerequisites to a class action prescribed by Fed.R.Civ.P. 23(a) were present, the district court then certified the class and subclasses under Fed.R.Civ.P. 23(b)(1)(B). We agree that this certification is appropriate.
*292 Rule 23(b)(1)(B) permits a class action to be maintained if a congeries of individual actions would “impair or impede” the interests of other members of the putative class. See Robertson v. National Basketball Association, 556 F.2d 682, 685 (2d Cir.1977). This test is met here. Drexel’s assets to satisfy the Securities Claims are finite. A succession of individual actions to determine Drexel’s liability on each claim would involve costly litigation, thereby depleting Drexel’s already limited resources. The diminution of Drexel’s estate from protracted litigation would doubtless reduce the amount ultimately recovered by each member of the putative class.
We recognize that the limited fund here is quite different from the limited fund present in most class actions under Rule 23(b)(1)(B). Because Drexel is in bankruptcy, its assets will not be distributed on the “first come, first served” basis that usually warrants class treatment under Rule 23(b)(1)(B). See Wright § 1774 at 441-443. Accordingly, a mandatory class action will not be appropriate in most bankruptcy eases. However, even though Drexel’s assets will not be distributed to claimants until final approval of Drexel’s reorganization plan, some members of the putative class might attempt to maintain costly individual actions in the hope and, perhaps, the belief that their claims are more meritorious than the claims of other class members. A mandatory class action under Rule 23(b)(1)(B) is thus necessary here to prevent claimants with such motivations from unfairly diminishing the eventual recovery of other class members.
For the same reasons that we find that the class can be maintained under Rule 23(b)(1)(B), we hold that the district court did not abuse its discretion in prohibiting any member of the putative class to opt out of the class. To allow a class member to opt out would involve costly litigation to estimate the amount of that member’s claim, thereby reducing Drexel’s already-limited fund of assets.
We are not unaware of the Supreme Court’s statement in Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), that “due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an ‘opt out’ or ‘request for exclusion’ form to the court.” Id. at 812, 105 S.Ct. at 2974. Shutts mandates that a plaintiff be permitted to opt out of a proposed class when the court does not have personal jurisdiction over the plaintiff. Id. at 811-12, 105 S.Ct. at 2974. Here, appellants have already submitted to the court’s jurisdiction by filing claims against Drexel. Because there is no question that the court has jurisdiction over appellants, Shutts is inapposite. Thus, the district court did not abuse its discretion in denying appellants the opportunity to opt out of the class.
III. Approval of the Settlement Agreement
We will ordinarily defer to a district court’s approval of a class action settlement unless there is a “clear showing” that the district court abused its discretion. E.g., TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456, 463 (2d Cir.1982); City of Detroit v. Grinnell Corp., 495 F.2d 448, 454-55 (2d Cir.1974). However, where, as here, the district court simultaneously certifies a class and approves a settlement of the action, we will more rigorously scrutinize the district court’s analysis of the fairness, reasonableness and adequacy of both the negotiation process and the proposed settlement. Weinberger v. Kendrick, 698 F.2d 61, 73-74 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).
The district court must consider many factors, including the complexity of the litigation, comparison of the proposed settlement with the likely result of litigation, experience of class counsel, scope of discovery preceding settlement, and the ability of the defendant to satisfy a greater judgment. Id.; see also Grinnell, 495 F.2d at 463. We conclude that the district court correctly held that these factors warranted approval of the Settlement Agreement.
This is a complex case. There are many plaintiffs trying to maximize their own re *293 covery, and there is a defendant with a limited fund to satisfy all claims. Prolonging the negotiation process will increase Drexel’s litigation costs, with a consequent decrease in the size of the fund. Class counsel are amply experienced in complex securities cases, and have analyzed countless documents and depositions to determine the amount of Drexel’s assets and the strength of the class’ claims. The negotiation process involved lengthy arms-length discussions between the class counsel, Drexel, and Drexel’s Fixed Creditors. The district court extensively supervised the negotiations. Finally, it is doubtful that Drexel could withstand greater exposure than that already enumerated in the Settlement Agreement. Accordingly, we believe that the Weinberger test has been met.
We need not toil over appellants’ argument that their absence from the negotiations irreparably tainted the settlement process. Had the district court permitted each securities claimant to take part in the negotiations, it is unlikely that any agreement at all could have been reached. We will defer to the district court’s management of the case, particularly because the district judge has had substantial experience in supervising complex securities cases. He has presided over both the SEC action against Drexel, and other cases involving Drexel and its former officers and directors. He knows the difficulties the class has had in proving its claims, and is aware of Drexel’s financial straits. Thus, we will not second-guess his decision to allow the SLCG alone to negotiate with Drexel.
Finally, appellants argue that the district court should have stricken the provisions of the Settlement Agreement that (a) enjoin subclass B from bringing any future actions against Drexel’s directors and officers, and (b) allow only subclass A and Drexel to share in the Pooled Recovery. Again, we are not persuaded.
In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor’s reorganization plan. See In re: A.H. Robins Co., 880 F.2d 694, 701 (4th Cir.), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). The Settlement Agreement is unquestionably an essential element of Drexel’s ultimate reorganization. In turn, the injunction is a key component of the Settlement Agreement. As the district court noted, the injunction limits the number of lawsuits that may be brought against Drexel’s former directors and officers. This enables the directors and officers to settle these suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.
We reject appellants’ argument that they should be permitted to share in the Pooled Recovery. When approving a settlement of a class action, a district judge need not ensure that the defendant designate a particular source of its assets to satisfy the class' claims. Rather, the district court need only examine whether the amount recovered by the class was fair in light of the Weinberger and Grinnell factors that we have already discussed. Because we find that these factors have been satisfied, we hold that the district court did not err in denying appellants’ request to share in the Pooled Recovery.
CONCLUSION
The district court properly certified the mandatory non-opt-out class and subclasses in accordance with Fed.R.Civ.P. 23(a), and correctly allowed the class action to be maintained under Fed.R.Civ.P. 23(b)(1)(B). The negotiation process leading to the Settlement Agreement was fair. The Settlement Agreement reflects the substantial efforts of all parties involved, and reasonably balances the competing interests of the parties. Accordingly, we hold that the district court did not err in certifying the mandatory non-opt-out class and subclasses, and in approving the Settlement Agreement.
AFFIRMED.

. 28 U.S.C. § 157(d) permits a district judge to “withdraw, in whole or in part, any case or proceeding ... if the [district judge] determines that the resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." Because the Securities Claims necessitated an examination of federal securities laws, Judge Pollack properly withdrew those claims from the bankruptcy court.

. On March 9, 1992, the District Court approved a global settlement (the "Global Settlement”) of these lawsuits. The Global Settlement provides for a total Pooled Recovery of $1.3 billion. We take judicial notice of the District Court’s order approving the Global Settlement pursuant to Fed.R.Evid. 201(f), which states “Judicial notice [of a fact not subject to reasonable dispute] may be taken at any stage of [a] proceeding."