## EDWARD COLLINS ET AL. *v.* ANTHEM HEALTH PLANS, INC.*

Superior Court, Complex Litigation Docket at Waterbury
File No. X01-CV-99-0156198S

Memorandum filed June 16, 2004

*Sweeney & Griffen* and *O'Brien, Shafner, Stuart, Kelly & Morris* and *Gallagher Law Firm,* for the named plaintiff et al.

*O'Brien, Shafner, Stuart, Kelly & Morris* and *Gallagher Law Firm,* for the plaintiff Enzo Sella et al.

* Reversed. *Collins* v. *Anthem Health Plans, Inc.,* 275 Conn. 309, 880 A.2d 106 (2005).

*Sweeney & Griffen,* for the plaintiff Connecticut Sports Medicine & Orthopedics, P.C. et al.

*Donahue, Durham & Noonan* and *Halloran & Sage,* for the defendant.

SHEEDY, J. The present case is before this court on remand from our state's Supreme Court, which reversed the order of the trial court, *Hodgson, J.,* granting partial class certification with regard to three of sixteen subparagraphs of the plaintiffs' second amended complaint.[1] Four causes of action sounding in breach of contract, tortious interference with business expectations, breach of the implied covenant of good faith and fair dealing and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., are there alleged. The plaintiffs named in the second amended complaint (complaint) are orthopedic physicians or groups thereof, who allege that they each had a written agreement with Anthem Health Plans, Inc., the defendant, which breached the agreement in several ways. The class of unnamed plaintiffs consists of all physicians who, from 1993 to the present, signed one of several agreements to provide medical services to the defendant's insureds. Subparagraph (b) of paragraph twenty of the first count and paragraph twenty-three of the second, third and fourth counts of the complaint assert the same factual allegation as the basis for each count; specifically, the defendant's failure to provide the plaintiffs named in the complaint and other similarly situated physicians with a consistent medical utilization-quality management and administration of covered services by paying financial incentive and performance bonuses to providers and Anthem Blue Cross and Blue Shield staff members

---

[1] Although the Supreme Court specifically referenced three causes of action; see *Collins* v. *Anthem Health Plans, Inc.,* 266 Conn. 12, 17, 836 A.2d 1124 (2003); the granting of certification was with reference to an amended complaint, which consisted of four identified causes of action.

involved in making utilization management decisions. Subparagraph (g) of paragraph twenty of the first count and paragraph twenty-three of the second, third and fourth counts allege that the defendant failed to maintain accurate books and records, which resulted in improper payments based on claims submitted. Subparagraph (m) of paragraph twenty of the first count and paragraph twenty-three of the second, third and fourth counts assert the defendant's failure to provide senior personnel to work with the plaintiffs or other similarly situated physicians. As to these three subparagraphs, the Supreme Court found that the trial court failed to make specific findings to support the conclusion that predominance was established as required by Practice Book § 9-8. The Supreme Court's directive provides in pertinent part: "On remand, the trial court is directed to determine whether the plaintiffs have established that the predominance requirement of Practice Book § 9-8 is satisfied with respect to paragraphs 20 (b), (g) and (m) of the complaint. To the extent that the predominance requirement is met with respect to paragraphs 20 (b), (g) and (m), the trial court is directed to reinstate the partial class certification order." *Collins* v. *Anthem Health Plans, Inc.*, 266 Conn. 12, 67–68, 836 A.2d 1124 (2003).

Paragraph 20 (j) of the first count of the complaint asserts that the defendant made "payments for services dependent on profiling, a practice whereby treatment and/or payment for covered services for the patient is permitted/disallowed in whole or part by the use of statistical averages for the treating physician." Paragraph 23 (j) of the second, third and fourth counts alleges that the same practice constitutes the causes of action there pleaded. As to these paragraphs, the trial court concluded that the commonality and typicality requirements of Practice Book § 9-7 were not satisfied. Our Supreme Court, however, identified the "harm"

that the representative plaintiffs were alleged to share with the class members was not nonpayment for services or termination from participation in the agreements but was, instead, "the practice itself, which looms as a threat of potential termination or underpayment for services." *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67. It found that the typicality requirement was satisfied and its directive to this court pertinent to that allegation was: "With respect to paragraph 20 (j) of the complaint, if the requirements of Practice Book § 9-7, other than typicality, and the requirements of Practice Book § 9-8 are met, the trial court is directed to grant partial class certification with respect to the issues raised in that paragraph." *Collins* v. *Anthem Health Plans, Inc.*, supra, 68.

I

PREDOMINANCE

Practice Book § 9-8 provides that an action may be maintained as a class action if the prerequisites of Practice Book § 9-7 are satisfied and the court finds that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." Our Supreme Court, while recognizing that the "predominance criterion is far more demanding than the requirement of commonality"; (internal quotation marks omitted) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 48; has provided guidance to the trial court in narrowing the focus of the necessary inquiry. "The predominance inquiry tests whether [the] proposed classes are sufficiently cohesive to warrant adjudication by representation. . . . Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." (Internal quotation marks omitted.) Id. Pertinent to this assessment,

the court noted that rule 23 (b) (3) of the Federal Rules of Civil Procedure "suggests consideration of the following four factors: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action." (Internal quotation marks omitted.) Id., 48–49. The court counseled a balancing of the economic benefits of proceeding with a class action against any procedural unfairness that might result from class certification. Id., 49–50, citing *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). There, the United States Supreme Court stated: "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee [on the Federal Rules of Civil Procedure] sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " Id., 615.

Both in its brief in opposition to the plaintiffs' motion for certification and in argument before this court on May 16, 2004, the defendant has argued that the court is required not merely to analyze the four causes of action asserted in the complaint, but also to consider each of the elements of those causes of action to determine whether each element can be established by generalized proof so as to satisfy the predominance requirement or whether proof of those elements requires individualized fact development. No authority has been cited for the broad proposition that predominance may only be established by this court analyzing

the proof method to be employed at trial so as to satisfy itself that each element of each cause of action pleaded can be proven and, therefore, the court rejects that notion. The defendant focuses its attention on the fourth count of the complaint (CUTPA) as exemplary of what it claims is fatal to establishing predominance. Regarding subparagraph (b), which asserts that the defendant's providing of financial incentives to physicians and performance bonuses to Anthem Blue Cross and Blue Shield staff members resulted in the failure to provide a consistent medical utilization-quality management, the defendant has argued that this court cannot find the predominance requirement is satisfied because proof that these practices were the proximate cause of an ascertainable loss will involve individualized fact development. It makes the same argument for subparagraphs (g), (m) and (j). Similarly, it argues that this court cannot find that the predominance requirement is satisfied with regard to the tortious interference claim of the second count without first concluding not only that each plaintiff had the requisite physician-patient relationship but that the court must also find that as a result of the policies alleged in subparagraphs (b), (g), (m) and (j), the patients either did not return for further medical services or that they returned less often. To do so would require this court impermissibly to decide the merits of the present case and to undergo the kind of analysis not required for resolution of the class certification issue, which focuses entirely on whether the requirements of Practice Book §§ 9-7 and 9-8 are met.

A different conclusion is required when one focuses on the four factors referenced by our Supreme Court as noted by rule 23 (b) (3) of the Federal Rules of Civil Procedure. Specifically, there is no reason to believe there are members of the class who want individually to control the prosecution or defense of separate actions. No members have been identified as wanting

to opt out of the class because they want to bring their own actions so as to control the litigation. Instead, the suggestion is strong that absent certification of the class, no other physician would bring a separate action, and the present case would be tried by the representative plaintiffs. Nothing suggests that any physician's stake in the outcome looms so large as to motivate that physician to control, for example, when and under what circumstances a settlement might occur. To the contrary, absent class certification, the rights of physicians who "individually would be without effective strength to bring their opponents into court at all" would not be vindicated. B. Kaplan, "A Prefatory Note," 10 B.C. Ind. & Com. L. Rev. 497 (1969). In fact, absent class certification, the alleged conduct would not only go undeterred but might also be encouraged, thus resulting not merely in uncompensated losses, but in perhaps more flagrant abuses. Even if the court assumes arguendo that an individual physician would be willing to take from his or her practice the time and attention required to prosecute such an action, it is unlikely that physician would find an attorney willing to bring the action, given the defendant's size and ability to finance a defense and what is likely to be a limited financial recovery. Nor, as the defendant argues, does the potential disparity between the financial losses proven by some individual physicians defeat class certification because "consideration of the issue of damages has never been held to bar certification of a class." *Marr* v. *WMX Technologies, Inc.*, 244 Conn. 676, 682, 711 A.2d 700 (1998). Thus, the first of the four factors to be considered weighs heavily in favor of certification.

Because there is only one other pending litigation involving similar issues,[2] our Supreme Court was not motivated to disturb the trial court's finding that this

[2] In argument before the Supreme Court, there was the suggestion that the Connecticut State Medical Society had raised similar issues in a class action asserted and brought against the same defendant. See *Collins* v.

factor was satisfied; thus, the second factor to be considered under rule 23 (b) (3) of the Federal Rules of Civil Procedure does not require the finding urged by the defendant.

The third factor to be considered weighs heavily in favor of class certification. It is highly desirable that the litigation of these claims be concentrated here on the complex litigation docket where a single judge familiar with the issues can manage the case and afford a consistency in the rulings and efficient adjudication of the issues. Also relevant is that the class consists of practicing physicians and, among the representative plaintiffs, are Waterbury orthopedic surgeons whose availability ensures class members' continuing representation.

With regard to consideration of the fourth factor, the difficulties to be encountered in the management of this litigation as a class action, the defendant's counsel argued to this court that the granting of certification would assure a nightmare. Visions of hundreds, perhaps thousands, of physicians with varying experiences and disparate damages claims "parading" through the courtroom were proffered (though, in fact, no consideration of the factors recited by our Supreme Court was offered either in the defendant's memorandum of law or at oral argument). That argument ignores that the assessment of damages is *always* an individualized process in class actions, the avoidance of which would encourage the artificial capping of class members, a result antithetical to achieving the purposes served by such actions. The argument also ignores that the trial of the present action can be managed so as to avoid the very scene pictorialized by the defendant's counsel. It could, for example, be bifurcated so that the jury first decides the issue of liability and, only if it finds liability on one or more

*Anthem Health Plans, Inc.*, supra, 266 Conn. 60. No such argument was raised to this court.

counts, assessment of damages might be accomplished by dividing the class into subclasses on the basis of such considerations as the governing agreements, the physicians' experiences, the effect of the defendant's policies on office practices or patient results, the claimed extent of the loss or other criteria. The damages assessment might be accomplished by the lawyers agreeing on a formula based on the previously suggested, or other criteria, which formula is then presented to the court for approval of settlement. If, in fact, the defendant insists on a jury determination of damages, the agreed formula together with the testimony of representative physicians from each subclass can be presented to the jury on various dates. Alternatively, the parties might agree to a jury determination of liability and a court assessment of damages based on an agreed formulaic basis. The damages assessment might be submitted to binding mediation. Resolution of that issue need only be as protracted, difficult or painful as the defendant may insist because the plaintiffs have, in their memoranda, expressed a willingness to approach the issue in a pragmatic yet creative way and, if it is at the insistence of the defendant that the trial is unnecessarily protracted for the reason it is unwilling to explore other solutions acceptable to all parties, the defendant ought not benefit from its argument that class certification would create unmanageability. Thus, a balancing of the four proposed factors supports class certification as to subparagraphs (b), (g), (j) and (m) of the complaint.

Within each of the certified issues, questions of law or fact common to members of the class predominate over questions affecting only individual class members, and the first of those may be specifically listed as follows. With regard to the payment of financial incentives or bonuses, all class members share an interest in the resolution of such common questions, all of which may be established by generalized proof, as: did the defen-

dant's agreements with class members require it to provide consistent medical utilization-quality management and administration of covered services? Was the payment of such incentives-bonuses an artifice designed to delay or deny payment to class members for covered services? Was the payment done with the intent to reduce or eliminate amounts paid to members for covered services? Was such payment with the intent to increase companywide savings? Was it the defendant's practice to pay incentivized physicians (primary care physicians) not to refer patients with specialized complaints to physicians within those specialties unless absolutely medically necessary? Was the payment of such incentives to decrease company costs and, thereby, to increase its profits? Was there the practice of paying incentives to the defendant's employees whose job it was to decide whether claims would be paid? Was the payment of such incentives a breach of the agreements to provide consistent medical utilization-quality management and administration of covered services? Did it have the effect of interfering with or destroying the physicians' relationships with their patients? Was it a wrongful interference with the plaintiffs' reasonable business expectations vis-á-vis their patients? Was it a failure to interact with physicians with whom it had agreements in a way that was fair and in good faith? Was the payment of such incentives an unfair or deceptive act or practice in the conduct of providing insurance coverage? If so, was that act or practice harmful to class members?[3]

With regard to each of the four issues considered here, this court rejects the defendant's suggestion that as regards the CUTPA count for example, the fact that some class members may not be able to demonstrate an "ascertainable loss" as a result of the alleged practice

---

[3] Neither this listing nor those that follow are intended to be exhaustive of the common questions of law or fact with regard to subparagraphs (b), (g), (m) and (j) of the complaint.

of paying bonuses and incentives means predominance may not be established as to that issue. To conclude so would require this court to undertake an evaluation of each class member's claim. In determining whether a class action is appropriate, it is not the court's function to determine whether the plaintiffs have stated a cause of action or whether they will in fact prevail on the merits. *Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S. Ct. 2140, 40 L. Ed. 2d 732 (1974). "[I]n determining whether to certify the class, a [trial] court is bound to take the substantive allegations of the complaint as true." (Internal quotation marks omitted.) *Rivera* v. *Veterans Memorial Medical Center*, 262 Conn. 730, 743, 818 A.2d 731 (2003). Pleadings should be construed broadly and realistically as opposed to narrowly and technically (as the defendant here urges). *Beaudoin* v. *Town Oil Co.*, 207 Conn. 575, 587–88, 542 A.2d 1124 (1988). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *General Telephone Co. of the Southwest* v. *Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). That probe is not, however, so exhaustive as to consider whether each class member can establish each of the elements of each cause of action pleaded, as the defendant argues; the analysis need only be sufficient to permit the conclusion that common questions of law or fact as to a particular issue predominate over individualized inquiries. As to subparagraph (b), this court concludes that the only issue requiring individualized inquiries is that of damages and, as already stated, individual consideration of the issue of damages has never been held a bar to class certification. The second predominate common question of law or fact with regard to the subparagraphs of the complaint at issue would be as follows. Subparagraph (g) of each count alleges the defendant's failure "to maintain accurate books and records whereby improper payments to the Plaintiffs were made based

on claim codes submitted." With regard to this issue, questions of law or fact common to class members that may be established by generalized proof include: did the defendant fail to provide class members a complete listing of claim codes applicable to the physicians' area of practice? Did it provide class members a new listing each time the defendant changed the claim codes? Did it *timely* provide a complete claim code listing each time the defendant changed claim codes? Did it provide class members a complete (as opposed to *representative*) fee schedule? Did it timely provide notice to class members of expected changes and the effective dates of changes regarding claim codes? Did it timely provide notice of anticipated changes and the effective dates of such changes regarding fee schedules? Did it respond to members' inquiries with regard to claim codes, fee schedules and payment of claims? Was the response to such inquiries timely? Did it provide regular and accurate statements to members and thereby permit the reconciling of claims made and disbursements paid? Was the failure to provide a timely and comprehensive fee schedule (or a complete claim code listing or a detailed statement of payments made) a breach of the defendant's agreements to maintain accurate books and records? Was such failure to provide so an artifice that enabled it to deny claims and, thereby, to effect companywide savings and increase profits? Did its failure to provide the same wrongfully interfere with the physicians' business expectancies? Did such failure cause financial harm to the plaintiffs? Was the failure to provide the same a deceptive act or practice in violation of General Statutes § 42-110b? Was that deceptive act or practice in violation of a state statute harmful to class members? Was it a breach of the defendant's implied obligation under the agreements to interact with providers in good faith and in a fair way? Numerous other common questions applicable to the class are relevant

to this issue. Only the damages assessment requires individualized inquiries. With regard to subparagraph (g), the predominance requirement is satisfied.

The third common question of law or fact would be as follows. Subparagraph (j) of each count asserts that the defendant made "payment for services dependent on profiling and other discriminatory practices." Pertinent to this issue are such common questions of law or fact as: did the defendant keep detailed records of the financial performance of the plaintiffs by utilizing various programs and company committees, i.e., the partners in achieving clinical excellence program, a provider profiling system, a performance based network management program, a medical cost containment committee? Was it a primary purpose of those programs to compare members' performance within their peer groups and as against the provider network as a whole for the purpose of identifying "high utilizers"–expensive providers–of available services? Did the defendant view "high utilizers" to be inefficient physicians? Did the defendant target class members identified as high utilizers for termination from the network? Did the defendant target for termination the top 10 percent in cost because they were identified as having consumed the most services relative to other utilizers within the network? Was the company's definition of "high utilizers" inconsistently applied to class members? Was the defendant's practice of profiling arbitrarily discriminatory? Did it breach agreements requiring it to provide covered services in accordance with applicable law? Was the practice harmful to the plaintiffs? Did it cause class members financial loss because, for example, members hesitated to perform or did not perform certain procedures for fear of being identified as high utilizers and targeted for termination? Was it a purpose of profiling to interfere with or destroy the plaintiffs' business expectancies? Did the practice of profiling wrongly and

detrimentally impact on the plaintiffs' business expectations? Did that practice breach an implied obligation of the defendant's agreements with the plaintiffs to interact with them fairly and in good faith? Was that practice an unfair or deceptive act or practice? Did it violate CUTPA? Did it cause class members an ascertainable loss? These and other common questions may be established by generalized proof. Common questions of law or fact as regards subparagraph (j) predominate over inquiries requiring individualized proof—damages issues only. There is predominance with regard to the issue of profiling.

The fourth common question of law or fact would be as follows. Subparagraph (m) of each count states that the defendant failed "to provide senior personnel to work with the plaintiffs." Specifically, the claim is that the defendant failed to provide a physician on call weekends for the purpose of preauthorizing procedures, and, though the plaintiffs needed to speak to a physician to obtain authorization, they instead were able to speak only to clerks. Without such opportunity for preauthorization, the plaintiffs claim, they ran the risk of the defendant's denial of payment. This issue poses such questions of law or fact common to the class as: were physicians on call each weekend to preauthorize emergency procedures? Were physicians on call other than from 9 a.m. to 5 p.m. to preauthorize emergency procedures? Were payments for such procedures delayed or denied for lack of preauthorization? Were class members required to make frequent calls seeking preauthorization because no physician was either on call or would take the call? Did the defendant discourage a physician from returning calls seeking preauthorization for emergency medical procedures? When members called for authorization, were the clerks who fielded the calls discouraged from referring the caller to a physician with authority to authorize? Did the

unavailability of senior personnel who could authorize emergency weekend or evening procedures deny the plaintiffs appropriate compensation for covered services? Did such unavailability of senior personnel breach the defendant's agreements to provide the plaintiffs timely utilization review and quality management? Did that breach impair the plaintiffs' conduct of their medical practices and thereby cause them harm? Did that breach adversely impact the plaintiffs' reputation within the community and thereby cause them harm? Did the unavailability of senior personnel with authorization power breach an implied obligation to interact fairly and in good faith with the plaintiffs? Was it the intent of the defendant in not providing such personnel weekends or evenings to cut costs and, thus, to increase its profits? If so, did that practice constitute an unfair or deceptive practice in violation of CUTPA? Did the conduct of that unfair or deceptive practice cause reputational harm? Did the practice of not having senior personnel available to the plaintiffs for purposes of utilization review result in wrongful interference with the plaintiffs' conduct of their medical practices? Issues requiring individualized proof relate to damages.

That the plaintiffs may have been affected differently by the previously described practices does not bar certification and would, at any rate, require this court to evaluate the merits of each plaintiff's claim. Yet, certification is dependent not on an analysis of merits or an evaluation of successful prosecution but on whether the requirements of Practice Book §§ 9-7 and 9-8 have been met. "[D]oubts regarding the propriety of class certification should be resolved in favor of certification." (Internal quotation marks omitted.) *Rivera* v. *Veterans Memorial Medical Center*, supra, 262 Conn. 743. Though mass tort cases are frequently brought and certified by district courts as class actions, disparities

among class members with regard to liability and damages and defenses invariably exist. Those disparities are not a bar to certification when, as here, interests common to each class member predominate. That is especially so when injunctive relief (as well as damages) is sought on each count because the fact that certain members may not be able to demonstrate actual financial loss does not preclude the granting of injunctive relief on any one or all of the certified claims and, thus, redress for each claim member in enjoining the conduct. The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy . . . ." *Amchem Products, Inc.* v. *Windsor*, supra, 521 U.S. 623. Each class member's professional obligations to provide quality patient care and the concurrent right to be appropriately compensated for such services is threatened by the conduct that provides the underpinnings of each of the four claims. To the extent that the plaintiffs are able to establish that the alleged misconduct caused harm or loss, each class member's interest in injunctive or monetary relief is shared by every other class member.

The defendant frequently cites Superior Court cases as authority for the proposition that an analysis of the predominance requirement obligates the court to determine whether class members will be able to establish at trial the elements of each of the four causes of action pleaded. Putting aside the concern for their precedential value, the defendant ignores again the proscription against determining the merits of a case when adjudicating a motion to certify and also ignores the preponderance of factual issues presented in those cases. The defendant frequently cites *Connecticut Cooling Total Air, Inc.* v. *Connecticut Natural Gas Corp.*, 46 Conn. Sup. 82, 738 A.2d 1167 (1999). There, the plaintiff's complaint alleged CUTPA violations in asserting that the defendant had engaged in unfair trade practices by

assigning unlicensed workers to perform plumbing, heating and piping work that state law required be performed by licensed workers and that that practice constituted unfair competition that resulted in lost revenues and profits for the plaintiff. The plaintiff also alleged that the defendant tortiously interfered with both existing and prospective contractual relationships by using unlicensed workers. The proposed class for which the plaintiff requested certification was far more free-range than is the class proposed here. It included all persons with Connecticut contractor licenses for the period November 8, 1992, to the present (1999), which licenses permitted them to do "plumbing and piping work . . . and/or heating, piping and cooling work," and all companies who used such licensed contractors during the relevant period and who have "regularly done or scheduled business in the geographic area served by the defendant"—some twenty-two densely populated towns.[4] (Internal quotation marks omitted.) Id., 83. Clearly, the different trades had issues peculiar to those trades not common to all of the class members. More persuasive to the trial court, however, was that the proposed class members competed "for the same business against one another as well as against the defendant, and each such business has an interest in claiming that it would have secured the contracts secured by the defendant, not only instead of the defendant, but also instead of other heating, piping and plumbing contractors, including other members of the proposed class." Id., 85–86. The court concluded that issues applying to individual potential class members predominated over issues common to all. Id., 85. In the present case, the interests of the potential class members are limited by claims made or to be made by physicians or

---

[4] Avon, Berlin, Bloomfield, East Hartford, Farmington, Glastonbury, Greenwich, Hartford, Hebron, Manchester, Mansfield, Marlborough, New Britain, Newington, Portland, Rocky Hill, Simsbury, South Windsor, Vernon, West Hartford, Wethersfield and Windsor.

physician groups only under specifically identified and existing provider agreements. Here, also, there is not the antagonism created by a class, as in *Connecticut Cooling Total Air, Inc.*, in which each class member was free within its own specialty to set its own hourly rates with the expectation of reimbursement at those rates or in which each contractor was, for example, at liberty to determine the "perks" included in service charges, i.e., same day service, free estimates and the like. The health care providers before this court could only receive that amount predetermined by this defendant (not itself a competitor of any class member). The "existing relationships" to be established are necessarily restricted to those patients for whom service has been or will be provided and for whom claims have been or will be provided. As to past services and past claims, they are readily identifiable; as to future services and claims, they will be circumscribed by the health care providers' medical specialties and reimbursement will be capped at a rate predetermined by the defendant.

Nor, as the defendant argues, is it so that predominance does not exist because individualized inquiry is necessary to satisfy, for example, the ascertainable loss element of a CUTPA violation. To establish liability for an alleged CUTPA violation, the plaintiff need not allege or prove the amount of the ascertainable loss but need only prove a loss that is "measurable even though the precise amount of the loss is not known." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981). " '[L]oss' necessarily encompasses a broader meaning than the term 'damage.' " Id., 613. "Where drafters meant 'actual damages,' they employed those exact words." Id. "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property." Id., 614. In the present case, every health care provider who can demonstrate victimization as a result of an unfair or deceptive practice or act and can demonstrate that what was

received differed from that which was bargained for has sustained an ascertainable loss. Liability will thereby be established.

Questions common to the class predominate over individual questions of law or fact and can be established by generalized proof. The partial class certification order with respect to subparagraphs (b), (g) and (m) of the plaintiffs' complaint is, therefore, reinstated. The predominance requirement is also satisfied regarding subparagraph (j).

## II
## PROFILING

This court has found the predominance requirement satisfied, and our Supreme Court has found typicality established regarding subparagraph (j). See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67–68.

Practice Book § 9-7 (1) requires that the class be so numerous that joinder of all members is impracticable. "Impracticality" does not mean "impossibility" but, rather, relates to the difficulty or inconvenience in joining all members of the class. See, e.g., *Sala* v. *National Railroad Passenger Corp.*, 120 F.R.D. 494, 497 (E.D. Pa. 1988). In a prior proceeding, the plaintiffs presented evidence that thousands of Connecticut physicians have contracted with the defendant and that those physicians' contracts subject them to the same administrative policies and practices as the representative plaintiffs are subjected to. There is the deposition testimony of Karen Clarke, the defendant's employee, that standard contracts were used for all eligible physicians. The plaintiffs have stated that there are approximately 950 groups and 3700 providers that would be part of the class. Profiling to target high utilizers for the purpose of eliminating them from the network is a threat to all members and, as our Supreme Court has stated, it is the *threat*—not the reality—of termination that is the harm. See *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67. The number is simply too large for individ-

ual lawsuits, and joinder is not practical. In the United States Court of Appeals for the Second Circuit, "[n]umerosity is presumed at a level of 40 members" of a putative class. *Consolidated Rail Corp.* v. *Hyde Park*, 47 F.3d 473, 483 (2d Cir.), cert. denied sub nom. *North Rockland Central School District* v. *Consolidated Rail Corp.*, 515 U.S. 1122, 115 S. Ct. 2277, 132 L. Ed. 2d 281 (1995). That some members of the proposed class may not share the representative plaintiffs' interest in pursuing this action is not pertinent to certification. Such plaintiffs may exercise their right to opt out. Numerosity is satisfied with regard to this claim.

"The threshold of 'commonality' is not high." *Jenkins* v. *Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). It requires only the same legal or remedial theory for the class claim. See *Macarz* v. *Transworld Systems, Inc.*, 193 F.R.D. 46, 49 (D. Conn. 2000) (commonality met if putative class members' grievances share common question of law or fact), citing 3B J. Moore, Federal Practice (2d Ed. 1996) § 23.06-1, p. 23-157. The federal analog requires only that there be questions of law or fact shared by the prospective class—not that all questions of law or fact raised be common. See 1 H. Newberg, Class Actions (3d Ed. 1992) § 3.10, pp. 153–58. Thus, it is required simply that there be a benefit to treating the members' claims in a single proceeding. As discussed here previously, the challenged practices are of general applicability to the entire plaintiff class and the members share all of the same questions of law and fact as here before listed with regard to the defendant's practice of profiling. Each class member shares the same interest in being free of the threat of termination from the network solely because they may have been identified as a frequent utilizer of medical procedures vis-a-vis their peers. The commonality requirement is satisfied.

The fourth and final requirement of Practice Book § 9-7 is that the "representative parties will fairly and

adequately protect the interests of the class." This requirement seeks to uncover whether there are any antagonistic claims among class members. See *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992), cert. dismissed sub nom. *Hart Holding Co.* v. *Drexel Burnham Lambert Group, Inc.*, 506 U.S. 1088, 113 S. Ct. 1070, 122 L. Ed. 2d 497 (1993). Counsel for the plaintiffs are experienced and well respected litigators. The claims of the representative plaintiffs are the same as those of class members. The defendant's argument misses the mark. That certain representative plaintiffs may not assert a claim for monetary damages ignores the request for injunctive relief and, again, raises a damages issue. The fact that certain representative plaintiffs have not been terminated from the network or have testified at depositions that they do not know if they have been underpaid because of their high utilization profile ignores the clear finding of the court in *Collins* that the "harm" alleged in profiling is not the reality of termination but the very practice of profiling, "which looms as a threat of potential termination or underpayment for services." *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 67. That threat permeates the entirety of the class. All seek a remedy to eliminate that threat. That there may be issues and problems unique to orthopedists and not shared by other class members is not relevant to whether there is a shared interest in eliminating the practice of profiling. Nor is the fact that the defendant has employed four or more different programs an impediment to this court's finding. So long as any one of those programs—or a combination thereof—has as its goal the profiling of health care providers solely on the basis of what the defendant deems to be "high" utilization of medical resources so as to drive down reimbursements, the threat persists. There is adequacy of representation.

Practice Book § 9-8 provides that an action may be maintained as a class action if there is predominance

(previously established here) and if the court finds that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." As our Supreme Court has said, in adding the superiority requirement of Practice Book § 9-8 to those of Practice Book § 9-7, the intent was to "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." (Internal quotation marks omitted.) *Collins* v. *Anthem Health Plans, Inc.*, supra, 266 Conn. 56. Pertinent to an analysis of this requirement are the same four factors to consider when undergoing the predominance assessment, specifically: "(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." (Internal quotation marks omitted.) Id., 56–57. For all of the reasons stated, along with those stated as well in *Collins* v. *Anthem Health Plans, Inc.*, supra, 57–60, this court incorporates those findings. The alternative to a class action—resort to perhaps thousands of individual actions—would be prohibitively expensive and a significant burden on the court system. The result would be a "multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green* v. *Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L. Ed. 2d 766 (1969). The notion that the claims of these class members could be litigated individually defies the reality of the time, effort and available resources in courthouses across this state. Because the defendant has raised no arguments not already raised and rejected in *Collins*, the court finds that the superiority require-

ment is satisfied and partial class certification is granted with regard to subparagraph (j).

## III

## CONCLUSION

There is certification of the class with regard to the issues raised by subparagraphs (b), (g), (m) and (j) of the plaintiffs' complaint.